# MANN *v.* TACOMA LAND COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF WASHINGTON.

No. 375.    Argued April 18, 19, 1894.— Decided April 30, 1894.

Scrip or certificates for public land, issued under the act of April 5, 1872, c. 89, 17 Stat. 649, "for the relief of Thomas B. Valentine," cannot be located on tide land in the State of Washington, covered and uncovered by the flow and ebb of the tide.

The general legislation of Congress in respect to public lands does not extend to tide lands.

On July 12, 1890, appellant as plaintiff filed his bill in the Circuit Court of the United States for the District of Washington to restrain the defendant from entering and trespassing upon certain premises. Subsequently, by leave of the court, an amended bill was filed. In that, plaintiff claimed title to three separate tracts. The allegations as to one were as follows:

"2. That on the 29th day of October, 1889, the following-

described premises were unoccupied and unappropriated lands of the United States, not mineral, and unsurveyed, to wit: Commencing at a point which is three thousand nine hundred and sixty feet west of the southeast corner of section 34, in township 21 north, of range 3 east, of the Willamette meridian, running thence north thirteen hundred and twenty feet, thence west thirteen hundred and twenty feet, thence south thirteen hundred and twenty feet, thence east thirteen hundred and twenty feet to place of beginning, and containing forty acres.

" 3. That on the said 29th day of October, 1889, your orator, under and by virtue of an act of the Congress of the United States, entitled ' An act for the relief of Thomas B. Valentine,' approved April 5, 1872, selected said tract of land as aforesaid described, at the United States land office at Seattle, Washington Territory, that being the land office for the district in which said lands were situated, and thereupon filed with the register and receiver of said land office certificate of location No. E 222 for forty acres, issued by virtue of a decree rendered by the Supreme Court of the United States upon the 6th day of January, 1874, for the claim of Thomas B. Valentine, or his legal assignee, under said act of Congress aforesaid, together with a description by metes and bounds of said described premises and a map of said tract, and on the 30th day of October, 1889, said selection was allowed, and your orator received from said register and receiver a certificate for said lands, entitling your orator to a patent to said lands when the same should have been surveyed by authority of the government of the United States.

" 4. That by virtue of said selection and certificate your orator is the owner of said described premises and entitled to the sole and exclusive possession of the same."

The title to the other two tracts was acquired in a similar way except that plaintiff did not claim to have himself entered them, but only to hold by deed from the locators. The character of the lands and the use to which plaintiff intended to put them were thus stated:

" 14. That all the lands described in this amended bill are

lands over which the tide ebbs and flows to a distance of 80 chains, and are what are designated on the plats and surveys of the United States as 'mud flats bare at low water,' and are overflowed at high water at a uniform depth of from 2 to 4 feet by the waters of Commencement Bay, at the head of Puget Sound, in Pierce County, State of Washington, and are situated about three-fourths of a mile from the line of low water of said Commencement Bay and at the mouth of the stream known as 'Puyallup River,' and are valuable and suitable for the construction of wharves, warehouses, commercial purposes, and for agricultural uses."

"19. That your orator intends filling in said lands aforesaid and erecting thereon warehouses and other buildings, over and across which lands general traffic may be carried on to and from the city of Tacoma."

It is upon these lands that the bill alleged that the defendant was trespassing. The certificates of location under which these tracts were entered, being what is known as "Valentine scrip," were issued under the authority of the act of Congress of April 5, 1872, c. 89, 17 Stat. 649, entitled, "An act for the relief of Thomas B. Valentine," which authorized the Circuit Court of the United States for the District of California to hear and decide upon the merits of the claim of Thomas B. Valentine to a certain specified Mexican grant. The third section of the act is as follows:

"Sec. 3. That an appeal shall be taken from the final decision and decree of the said Circuit Court to the Supreme Court of the United States, by either party, in accordance with the provisions of the tenth section of said act of March third, eighteen hundred and fifty-one, within six months after the rendition of such final decision; and a decree under the provisions of this act, in favor of said claim, shall not affect any adverse right or title to the lands described in said decree; but in lieu thereof, the claimant, or his legal representatives, may select, and shall be allowed, patents for, an equal quantity of the unoccupied and unappropriated public lands of the United States, not mineral, and in tracts not less than the subdivisions provided for in the United States land laws, and, if

unsurveyed when taken, to conform, when surveyed, to the general system of United States land surveys; and the Commissioner of the General Land Office, under the direction of the Secretary of the Interior, shall be authorized to issue scrip, in legal subdivisions, to the said Valentine, or his legal representatives, in accordance with the provisions of this act: *Provided*, That no decree in favor of said Valentine shall be executed nor be of any force or effect against any person or persons; nor shall land scrip or patents issue as hereinbefore provided, unless the said Valentine shall first execute and deliver to the Commissioner of the General Land Office a deed conveying to the United States all his right, title, and interest to the lands covered by said Miranda grant."

Proceedings were had under this statute in the Circuit Court, and a decree was rendered in favor of the claimant, which afterwards and on January 6, 1874, was affirmed by this court. The facts respecting this grant are thus stated by the Secretary of the Interior in a decision quoted by plaintiff's counsel:

"On investigation of the facts relative to the Miranda grant, I find that on October 8, 1844, Manuel Micheltorena, Mexican governor of California, granted to Juan Miranda the place known as Rancho Arroyo San Antonio, bounded by the laguna and arroyo of the same name and the pass and estero of Petaluma, containing three square leagues, more or less.

"California was acquired from Mexico by the treaty of Guadalupe Hidalgo, and by the eighth article of said treaty the United States stipulated to protect the property rights of all residents within the ceded territory, in the same manner that the property rights of its own citizens were protected.

"This treaty did not, *proprio vigore*, operate as a confirmation of Mexican grants, but, on the contrary, being executory in character, it addressed itself to the political department of the government, and the duty devolved upon Congress of providing means for its enforcement.

"Congress, therefore, by act approved March 3, 1851, established a board of land commissioners, with power to investigate the validity of said grants and titles, with right to appeal to the United States District and Supreme Courts.

" The Miranda grant was presented for confirmation to the board of land commissioners by Valentine, and also by the grantees of one Ortega, who was Miranda's son-in-law. These parties claimed adversely to each other, and Valentine finally withdrew his claim, intending, it is alleged, to intervene in the District Court. Before the case was reached for trial in said court the Supreme Court had rendered a decision which precluded him from asserting his title by intervention. Ortega's claim was, therefore, prosecuted by his grantees, until finally rejected by the Supreme Court of the United States.

· " After the claim of the grantees of Ortega was rejected the lands were disposed of like other public lands, and the proceeds covered into the treasury.

" Subsequently, Valentine produced satisfactory evidence that the land had been lawfully granted to Miranda by the Mexican authorities and conveyed to him by mesne conveyances, and Congress passed the act granting to Valentine an amount of scrip equal to the amount of land contained in said grant." 6 Copp's Land Owner, 28.

To this bill a demurrer was filed, and on October 22, 1890, a decree was entered sustaining the demurrer and dismissing the bill, from which decree of dismissal plaintiff brought his appeal to this court. The case was argued with *Baer v. Moran Brothers Company, post,* 287.

*Mr. Theodore H. N. McPherson* for Mann, appellant.

*Mr. John H. Mitchell,* (with whom were *Mr. Beriah Brown, Jr.,* and *Mr. M. L. Baer* on the brief,) for Baer, plaintiff in error.

It is not our purpose to antagonize the deliberate conclusions of this court as set out in the opinions in the two recent cases of *Illinois Central Railroad* v. *Chicago,* 146 U. S. 387, and *Shively* v. *Bowlby,* 152 U. S. 1, but to endeavor to show that the decisions in those cases are inapplicable to and not controlling in the case involving lands of the character involved in this action, namely, a portion of a tract of overflowed lands, bare at low tide, on the outskirts of a bay on

Puget Sound, including over 3000 acres, and extending for about two and one-half miles in length to three miles in width, as shown by the maps of the official surveys of the United States Coast and Geodetic Survey, copy of which is found attached in our brief.

This court will take judicial knowledge of the tide flats, otherwise designated as " mud flats," lying on and adjacent to the bays and inlets of the waters of Puget Sound. *Peyroux* v. *Howard*, 7 Pet. 324; *The Apollon*, 9 Wheat. 362, 374; *United States* v. *Lawton*, 5 How. 10, 15.

It is respectfully submitted there is nothing whatever in this record from beginning to end to show that the land involved in this action, or any part of it, is what is commonly designated in the laws as " shore" or " tide land" bordering on a navigable water, but on the contrary, this record fairly construed, even in the absence of any consideration of the public surveys of the United States, shows this tract to be just what it is in fact, a part of an immense area of " overflowed lands," " mud flats," or " tide flats" overflowed by high tides and bare at low tides. From the location, in King County, State of Washington, overflowed presumably by the unnavigable waters of some bay or inlet of the waters of Puget Sound. The magnitude of the area included and its shape, being 40 acres and in a solid square, precludes the supposition that it is ordinary " shore" or " tide water lands." Furthermore, the description in the complaint, it must be borne in mind, is not " the shore," or part of " the shore," not " tide lands," but " a portion of the tide flats;" clearly indicating that the land in question is a part of one of the many vast areas located at different points adjacent to the bays and inlets of Puget Sound, and designated on the geodetic surveys of the United States as " mud flats." In other words, the description contained in the complaint, instead of meaning ordinary shore or tide lands, is equivalent to an averment of " overflowed lands."

The terms " shore" or " tide lands" are synonymous. They include in their definition the shore lands lying on a navigable river or arm of the sea, covered and uncovered by the tides,

and in which there is a *jus publicum;* while "swamp" or "overflowed lands," whether made swamp or overflowed by tide or other waters, *Irwin* v. *San Francisco Savings Union,* 136 U. S. 578, are entirely different. The averment in the complaint that these are "tide flats" is equivalent to an averment that they are what are technically known in the law as "overflowed lands," as contradistinguished from "shore" or "tide lands." The averments in the complaint, taken altogether, are equivalent in description to the term "overflowed lands" as used in the swamp land acts.

This court, in the case of *Shively* v. *Bowlby,* 152 U. S. 1, unqualifiedly concedes the power of the Congress of the United States to dispose of what is known as tide lands on the shores of navigable waters in any Territory of the United States, when necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory.

It is submitted that the grant under which the plaintiff claims in this case is clearly one which the Congress of the United States (and it is the sole judge, and its decision is not reviewable by the courts) deemed necessary "in order," to use the language of Mr. Justice Gray in the opinion in *Shively* v. *Bowlby,* "to perform international obligations," or, more properly speaking, an international obligation.

By the treaty of Guadalupe Hidalgo between this country and Mexico, the United States obligated themselves to recognize all valid grants of land within the limits of the Territory ceded, before that time, made by the governments of Mexico and Spain. *Botiller* v. *Dominguez,* 130 U. S. 238.

Juan Miranda was the holder of a Mexican grant called the Rancho Aroyo de San Antonio, located in the county of Sonoma and State of California, about 13,000 acres, part of which were tide flats and overflowed lands, in all respects similar to the lands in controversy.

It is submitted the act of April 5, 1872, under which the

Valentine scrip was issued, was clearly the performance, upon the part of the Congress, of an "international obligation." It was a recognition, upon the part of the United States, of the validity of the Miranda grant, and of the rights of Miranda, the grantee thereunder.

Instead, however, of giving Miranda or his grantee, Valentine, the 13,000 acres included in the Mexican grant, part of which were tide flats and overflowed land, an exchange was made, and what was deemed and determined to be, by a judicial court whose decision was affirmed by this court, an equivalent in value of the public lands of the United States was granted. This, therefore, was not only a grant of public lands in any and all of the Territories of the United States within the power of Congress to grant, but it was clearly the *intention* of the Congress to include within its provisions every character of public lands, whether upland, tide lands, tide flats, overflowed or swamp land, not otherwise occupied or appropriated and not mineral, included in the Miranda grant. The grant being, moreover, not a gift or donation, but an exchange of lands, or a grant, in other words, for a full and adequate consideration.

In this view, therefore, we confidently insist that the doctrine enunciated by this court in *Shively* v. *Bowlby,* clearly supports the contention of the plaintiff in error.

This court, in *Shively* v. *Bowlby,* suggests that it has not been the policy of the government to grant lands between high and low water mark to individuals piecemeal, though it is admitted that it has made and confirmed such grants when necessary to carry into effect the obligations which it has assumed by treaty.

If any "policy" has been pursued by the Executive Department of the government on the question of tide lands in the Territory of Washington, that policy, as it appears, was to permit their survey and entry under general land laws whenever of sufficient extent and value to warrant the belief that they could be reclaimed from the sea and cultivated, and whenever so situated that their reclamation would not injure the public right of use of waters navigable in fact.

The only manner from which it can be determined what the policy of a government has been in relation to any subject is to look for either legislative declarations of that policy, or executive acts from which it could be concluded.

It is notorious that there have been thousands of acres of lands lying below the line of ordinary high tide, and so returned on the government surveys, surveyed and patented under general laws in the Territory of Washington.

The reason why such lands have been so surveyed and patented is owing to the peculiar condition of things there, in the vast extent of such lands, and the further fact that the upland is covered with an enormous growth of very heavy timber, making the work of fitting it for cultivation expensive and slow. In such circumstances, the settlers soon found that it was far cheaper to reclaim tide lands from the sea, even by the erection of extremely high and strong dikes, than to attempt to remove the existing timber on the high land, not to mention that the reclaimed tide lands formed of alluvial deposits were infinitely richer than the high land. The earliest and choicest selections of farming land under the general land laws in western Washington, were made of land lying wholly below ordinary high water mark, and to-day it is possible to pass, in an ordinary high water, on a steamer past farms protected by dikes, where the whole cultivated area of the farm lies many feet lower than the surface of the water.

It is respectfully submitted that Congress, in disposing of the public lands, has not, by any means, acted upon the theory that lands known as ordinary tide lands, between high and low water mark, on navigable waters, in Territories of the United States, were not disposable, and should be held as public highways, unless in case of some international duty or public exigency by the United States in trust for the future States. Upon the contrary, it is respectfully and confidently insisted that the instances in which Congress has acted upon the contrary theory, are so numerous as to constitute the rule and not the exception.

But even admitting that it has not been the customary policy of the Executive Department to permit such lands to

be entered under the general land laws, what is the case at bar? The plaintiff in error is not claiming land under any general land law, but under a special grant of Congress. He is not restricted by the act to lands subject to entry under general land laws, but the exceptions are expressly enumerated in his grant.

It is to be presumed that Congress knew the law, and knew that it had an unrestricted right to dispose of all the tide lands in the Territory of Washington. The mind of the legislature was upon exceptions when the grant was made, and numerous exceptions were made as to the class of lands which Valentine was not to be permitted to take by virtue of his grant. But tide lands or lands below high water mark were not enumerated among those exceptions, and by every rule of construction of either grants, laws, or contracts — and the act of 1872 partakes of the nature of all — all classes of lands which Congress had the power to grant, and which were not excluded in express terms, were among those of which he was authorized to make selection.

We submit, from the foregoing exposition of the law and facts, that these lands are public lands of the United States and subject to entry under the act of March 5, 1875.

*Mr. Joseph H. Parsons* filed a brief on behalf of Louis Largie, intervenor, in both cases.

*Mr. Samuel Dickson* and *Mr. Frederic D. McKenney* for the Tacoma Land Company, appellant.

*Mr. Frederic D. McKenney*, with whom was *Mr. Samuel Field Phillips*, filed a brief for Dearborn, intervenor in *Baer* v. *Moran Brothers Company*.

*Mr. John P. Fay* filed a brief on behalf of Dearborn, intervenor in *Baer* v. *Moran Brothers Company*.

*Mr. W. C. Jones*, Attorney General of the State of Washington, filed a brief on behalf of the State, intervenor in *Baer* v. *Moran Brothers Company*.

*Mr. Edwin B. Smith* closed for Mann, appellant.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The single question in this case is as to the title of plaintiff to the premises. The lands are tide lands, covered and uncovered by the flow and ebb of the tide, and are situated in Commencement Bay, near to the city of Tacoma. He does not claim by any grant from the State of Washington, nor by any act of Congress specifically granting him these lands, or in terms providing for the location of scrip upon tide lands, but insists that, although the statute under which this scrip was issued, only authorized its location upon "unoccupied and unappropriated public lands," he had a right to locate it upon these tide lands, and acquire full title thereto.

That the title to tide lands is in the State is a proposition which has been again and again affirmed by this court, some of the earlier opinions going so far as to declare that the United States had no power to grant to individuals such lands at any time, even prior to the admission of the State and during the territorial existence. However, in the recent case of *Shively* v. *Bowlby,* 152 U. S. 1, after a careful review of the authorities, it was held that the denial in those opinions of the power of Congress to make such a grant was not strictly correct; but it was also held that, although Congress could, it had never undertaken by general laws to dispose of such lands, and in the summing up at the close of the opinion it was stated: "The United States, while they hold the country as a Territory, having all the powers both of national and of municipal government, may grant, for appropriate purposes, titles or rights in the soil below high water mark of tide waters. But they have never done so by general laws; and, unless in some case of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the Territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under

them, to the control of the States, respectively, when organ-
ized and admitted into the Union."

It is unnecessary, in view of this recent examination of the
question, to enter into any discussion respecting the same. It
is settled that the general legislation of Congress in respect to
public lands does not extend to tide lands. There is nothing
in the act authorizing the Valentine scrip, or in the circum-
stances which gave occasion for its passage, to make an excep-
tion to the general rule. It provided that the scrip might be
located on the unoccupied and unappropriated public lands,
but the term "public lands" does not include tide lands. As
said in *Newhall* v. *Sanger*, 92 U. S. 761, 763: "The words
'public lands' are habitually used in our legislation to describe,
such as are subject to sale or other disposal under general
laws." See also *Leavenworth &c. Railroad* v. *United States*,
92 U. S. 733; *Doolan* v. *Carr*, 125 U. S. 618.

Further, in the act of February 22, 1889, c. 180, providing
for the admission of Washington, Montana, and the two
Dakotas, into the Union, 25 Stat. 676, 677, among the condi-
tions imposed was this: "That the people inhabiting said pro-
posed States do agree and declare that they forever disclaim
all right and title to the unappropriated public lands lying
within the boundaries thereof." No one can for a moment
suppose that it was the thought of Congress to change the
whole policy of the government and reserve to the nation the
title and control of the soil beneath the tide waters and those
of navigable streams. Indeed, in the constitution of Wash-
ington, (art. 17, sec. 1,) there is an express assertion of the
title of the State to the tide lands within its borders.

That there was no intent in the Valentine scrip act to make
any exception to the general rule is evident not merely from
the use of a term having such. an accepted meaning, but from
the further provision that the land, "if unsurveyed when taken,
to conform, when surveyed, to the general system of United
States land surveys," for under that general system surveys
are not extended to tide lands, nor those under navigable
rivers above tide water.

In *Barney* v. *Keokuk*, 94 U. S. 324, 338, it was said: "The

United States has wisely abstained from extending (if it could extend) its survey and grants beyond the limits of high water."

But it is claimed that there is a peculiar equity attaching to the Valentine scrip because the Miranda grant in fact embraced tide lands, and was of great value — $2,000,000 as stated in the debate in Congress. It is said by counsel that the intention of Congress, as indicated by this act, under the circumstances, was manifestly to give Valentine the right of selection of lands of the United States belonging to the same classes as were to be found in the Miranda grant, which he relinquished. The import of the language is precisely this, and the contract to be equal requires the construction which the language plainly means. Any other construction would be against the just intentions of the national legislature.

So far as respects the great value of the Miranda grant, it was that which was created by the building up of a city within its borders, and not something which inhered in the land itself. So that when Valentine failed to secure a confirmation of that grant, he was not losing property which was of the value of $2,000,000 when granted by the Mexican government, but only losing the opportunity to appropriate $2,000,000 worth of value created by the labors of others upon lands to which they supposed they had title.

Further, as appears from the statement made by the Secretary of the Interior, he had lost all legal right to this land, for when a commission had been provided for investigating the validity of such claims, he presented his claim for confirmation and then withdrew it. Congress had fulfilled all obligations to him growing out of the treaty with Mexico, and when by his own act he had forfeited his legal claims to the land, it was a mere act of grace by which was given to him the right to select an equal amount of land elsewhere. If Congress had thought that it was necessary in order to do justice that he should be permitted to select an equal quantity of land of like character, it was easy to have expressed that intention. Having failed to do so, and omitted any reference

to tide lands, its donation to him is to be construed as any other grant of the government, and no unexpressed and unsuggested intention should be attributed to Congress — certainly no intention to make the people of the State of Washington, who otherwise would receive these tide lands for their general benefit, suffer by reason of his neglect to properly assert his claim to lands in the State of California. There is, therefore, nothing in this matter of the Valentine scrip to take the case out of the rule laid down in *Shively* v. *Bowlby.*

Reliance is also placed on article 17, section 2, of the constitution of the State of Washington, which reads: "The State of Washington disclaims all title in and claim to all tide, swamp, and overflowed lands patented by the United States; provided, the same is not impeached for fraud." In respect to this it is enough to say that these lands were not patented. It is doubtless true, as said by this court in *Stark* v. *Starrs,* 6 Wall. 402, 418, that "the right to a patent once vested is treated by the government when dealing with the public lands, as equivalent to a patent issued." But here there was no right to a patent. The entry in the local land office, and the receipt issued by the local land officers, were unauthorized acts, and gave no right to a patent; and it cannot be supposed that the State of Washington, when it excluded from its claim of title lands which the government had in the due administration of its land department disposed of by a patent, meant thereby to exclude every tract for which a local land officer might wrongfully issue a receiver's receipt.

These are all the matters involved in this case. We see no error in the ruling of the Circuit Court, and its decree is

*Affirmed.*