### CORRIGAN v. BROWN et al.

(Circuit Court, W. D. Washington, N. D. November 6, 1907.)

#### No. 1,093.

1. NAVIGABLE WATERS (§ 36*)—LAND UNDER WATER—OWNERSHIP.

The state of Washington on coming into the Union acquired ownership of the shores and bed of all navigable waters up to the line which in the surveys of the public lands of the United States constituted the boundary between land and water; which survey fixed prima facie the limits of the public land which might be disposed of by the United States, and outside of which only could the state claim ownership of the shores and beds of navigable water.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 184; Dec. Dig. § 36.*]

2. NAVIGABLE WATERS (§ 36*)—LANDS OF STATE—OVERFLOWED LANDS.

Surveyed lands within the government line separating land from navigable water, covered by marsh grass and not overflowed by ordinary high tide, belonged to the United States and not to the state, as a part of the shore of navigable water.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 186; Dec. Dig. § 36.*]

3. INDIANS (§ 12*)—INDIAN LANDS—RESERVATIONS—DISCLAIMER BY STATE.

Const. Wash., providing that the people disclaimed all title to the unappropriated public lands of the state, and to all lands lying within its limits owned or held by any Indian or.Indian tribes, applied to all lands within the boundaries of Indian reservations within the state to which the primary right of occupancy of the Indians had not been extinguished.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 27; Dec. Dig. § 12.*]

4. INDIANS (§ 12*)—INDIAN LANDS—OWNERSHIP.

The state of Washington by its Constitution disclaimed all right to unappropriated public lands within its boundaries owned or held by any Indian or Indian tribes, jurisdiction over which was conceded to remain in the United States. By an Indian treaty in 1885, land was reserved for the exclusive use of the tribe of Indians to which defendants belonged, and by the President's order in 1873 the boundaries of the reservation were precisely established, including the land in controversy extending to low-water mark. *Held*, that such land lying above low-water mark, though sometimes inundated by high tide, was within the power of disposal by the United States to Indians residing on the reservation, and did not pass by a conveyance by the state as land comprising the shore of navigable water.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 27; Dec. Dig. § 12.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. Public Lands (§ 185*)—Lands of State—Shore Lines.
     The state of Washington has power to sell its tide and shore lands.
     [Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 598; Dec.
     Dig. § 185.*]

On the Merits.

James B. Howe, C. F. Munday, and C. H. Farrell, for complainant.
Potter Charles Sullivan and Jesse A. Frye, for defendants.

HANFORD, District Judge. The object of this suit is to settle a controversy respecting ownership of a tract of land described as lot 3, section 14, township 34 north, range 2 east of the Willamette meridian, in Skagit county, state of Washington. The complainant contends that the state of Washington holds the legal title, and bases his claim upon a contract to purchase it from the state. The defendants are Indians, and they claim the tract by virtue of a patent from the United States to them as allottees of Indian reservation lands.

The court finds as a fact, established by the evidence, that the tract is tide-marsh land, which is periodically inundated by salt water when the flood tides are highest, but it is sufficiently elevated above sea level to admit of a growth of salt-marsh grass, and has some value for pasturage in its unimproved condition. Thousands of acres of similar land in the vicinity have been reclaimed by being inclosed within dikes and made productive.

The following is a statement of undisputed facts:

That, at the time of the admission of the territory of Washington into the Union of the United States, said lot 3 had never been patented by the United States to any one. That on the 28th day of October, 1901, the state of Washington, for a valuable consideration to it paid by the complainant, made, executed, and delivered to complainant a contract, whereby said state of Washington agreed to convey to complainant, upon the receipt of the purchase price mentioned in said contract, the said lot 3 and other property. That, at the time of filing the amended bill of complaint in this cause, said lot 3 was not in the possession of any one, but was vacant land on which there were no improvements, and that it was wholly unoccupied, and was covered by the waters of Puget Sound at times of high tide. That at the time this suit was removed to this court, and at the time of the filing the amended bill of complaint herein, said lot 3 exceeded in value the sum of $2,000, exclusive of interest and costs. That by a treaty made and entered into between the United States of America, on the one part, and the Dwamish, Swinomish, and other allied and subordinate tribes and bands of Indians, then occupying certain lands, situated in the then territory of Washington, at Muckl-te-oh, or Point Elliott, on the 22d day of January, 1855, there was reserved for the use and occupation of said bands and tribes of Indians the peninsula at the southeastern end of Perry's Island called "Shais-Quihl." That said treaty provided, among other things, that all of said tract of land should be set apart, and, so far as necessary, surveyed and marked out for the exclusive use of said Indians, and that no white man should

be permitted to reside upon the same without the permission of said Indians or the superintendent or agent. That on the 9th of September, 1873, the President of the United States, by executive order, ordered that the northern boundary of the said Swinomish reservation should be as follows, to wit: Beginning at low-water mark on the shore of Similk Bay, at a point where the same is intersected by the north and south line bounding the east side of the surveyed fraction of 9.30 acres, or lot No. 1, in the northwest corner of section 10, in township 34 north, range 2 east; thence north on said line to a point where the same intersects the section line between sections 3 and 10 in said township and range; thence east on said section line to the southeast corner of said section 3; thence north on east line of said section 3 to a point where the same intersects low-water mark on the western shore of Padilla Bay. That by the enabling act passed by the Congress of the United States on the 22d day of February, 1889 (25 Stat. 676, c. 180), providing, among other things, for the admission of Washington Territory into the Union of the United States, it was provided, among other things, as follows:

"That the people inhabiting said proposed states do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States."

That, in the pursuance of said enabling act, the people of the state of Washington, in the Constitution of the state of Washington adopted by them, entered into a compact with the United States, providing, among other things, as follows:

"That the people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries of this state, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain under the absolute jurisdiction and control of the Congress of the United States * * *."

That by article 7 of said treaty of January 22, 1855, it was provided, among other things, that the President of the United States might in his discretion cause the whole or any portion of the lands reserved by said treaty to be surveyed into lots, and that he might assign said lots to such individuals or families of Indians as were willing to avail themselves of the privilege, and who would locate on the same and make it their permanent home. That, in pursuance of said provision of said treaty, said reservation was thereafter, to wit, on the 17th day of January, 1874, surveyed into lots; and that thereafter, to wit, on the 17th day of June, 1897, there was deposited in the General Land Office of the United States an order of the Secretary of the Interior, accompanied by a return from the Office of Indian Affairs, a list, approved June 15, 1897, by the President of the United States, showing the names of the Indians who had made selection of land in accordance with the provisions of said treaty. And that thereafter, and in pursuance of said treaty, there was assigned

and allotted to the defendant John Brown and his heirs, together with other lands, lot 3, in section 14, township 34 north, range 2 east, Willamette meridian, being the land involved in this suit. That on the 15th day of September, 1897, in pursuance of said treaty, the said defendant John Brown having complied with the terms and conditions of said treaty, there was issued to the defendant John Brown by the United States a patent giving and granting unto the said defendant John Brown and his heirs said lot 3, subject to the restriction, however, that the same should not be alienated or leased except as provided in said treaty. That said lot 3 hereinabove, and in the bill of complaint herein described, so surveyed, allotted, assigned, and patented to the defendant John Brown and his heirs is now, and since the establishment of said Swinomish Indian reservation has been, within the boundaries and an integral part of said Swinomish Indian reservation so set apart and established by said treaty and by said executive order.

The state of Washington, upon coming into the Union on terms of equality with the original states constituting this nation, asserted ownership of the shores and beds of all navigable waters up to a certain line; that is, the line of ordinary high water. That line is generally understood to be the line which in the surveys of the public lands of the United States constitutes the boundary between land and water. Therefore, the survey made under national authority fixes, prima facie, the limits of the public land which may be disposed of by the United States government, and outside that limit only can the state claim ownership of the shores and beds of navigable water. Mann v. Tacoma Land Co. (C. C.) 44 Fed. 27, affirmed by the Supreme Court of the United States, 153 U. S. 273, 14 Sup. Ct. 820, 38 L. Ed. 714.

The tract in question being surveyed land, there is a necessary presumption that it is not state land. If the accuracy of the survey with respect of the line between land and water can be disputed, it must certainly require convincing evidence to justify any court in rendering a decree establishing a different boundary. In this case there is contradictory evidence as to the frequency of the tides which overflow this tract. It is an undisputable fact, however, that the land is covered with a growth of marsh grass, which would not be there if the ordinary high tides overflowed it, and it is the decision of the court that the complainant has failed to produce evidence sufficient to impeach the survey.

The complainant has failed in his contention for another reason, viz: The disclaimer of the state contained in the Constitution adopted by the people applies to all lands within the boundaries of Indian reservations to which the primary right of occupancy of the Indians has not been extinguished. By the treaty made with the Indians in 1855, land was reserved for the exclusive use of the tribe or band of Indians to which the defendants belong, and by the President's order made in 1873 the boundaries of the reservation were precisely established, so that the reservation includes all the land above the line of low water. Therefore, beyond any question, this tract of land is entirely within the boundaries of a reservation to which the rights of the Indians have never been extinguished, and it is comprehended by

the disclaimer in the state Constitution. In the argument the validity of the disclaimer is questioned on the assumed ground that the state cannot abdicate its sovereign powers. This argument is itself suggestive·of a very satisfactory answer; that is, if the title of the state is inalienable, so that a grant or disclaimer of ownership is ultra vires, then the state could not sell this land to the complainant, and he has no standing in court to assert any rights with respect to this tract.

I do not rest my decision, however, upon a denial of the authority of the state to sell its tide and shore lands; on the contrary, I concur with the Supreme Court of the state in its decision rendered in the case (Jones v. Callvert, 32 Wash. 612, 73 Pac. 701), giving full effect to the disclaimer according to the manifest intent of the people by, whom the Constitution was adopted.

I direct that a decree be entered that the complainant take nothing, and that the defendants recover their taxable costs.