950 P.2d 1130 (1997)
Daryl JAMES, George James, Embert James, Loren James, and Lillian Charles, Petitioners,
v.
STATE of Alaska, Respondent.
No. S-7350.
Supreme Court of Alaska.
December 26, 1997.
*1131 Susan M. Crocker, Assistant Public Defender, Ketchikan, John B. Salemi, Public Defender, Anchorage, for Petitioners.
Joanne Grace, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Respondent.
Before COMPTON, C.J., and MATTHEWS, EASTAUGH and FABE, JJ.

OPINION
MATTHEWS, Justice.

I. INTRODUCTION

The question presented is whether the State owns submerged lands within the exterior boundaries of the Tongass National Forest. Under the equal footing doctrine and the Submerged Lands Act, title to submerged lands is conveyed to a new state at statehood unless a prior withdrawal was clearly intended to include submerged lands, and unless the United States clearly intended to defeat the future state's title to the submerged lands so withdrawn. Intent to include submerged lands within a withdrawal may be inferred from the purpose and language of a withdrawal. The purposes of the proclamation creating the Tongass do not require submerged lands and its language does not suggest that submerged lands were included. We conclude that the submerged lands were not included within the proclamation, and that they thus passed to the State.

II. FACTS AND PROCEEDINGS

Daryl, Loren, Embert, and George James, and Lillian Charles (Defendants) were charged with illegally possessing herring roe on kelp in violation of AS 16.05.920(a).[1] The Defendants possessed more herring roe on kelp than was permitted under their subsistence permits.[2] The herring roe on kelp was harvested from coastal waters within the exterior boundaries of the Tongass National Forest (Tongass).
Defendants moved to dismiss the charges. They argued that the State did not have *1132 jurisdiction because the activity was regulated by federal law under the Alaska National Interest Lands Conservation Act (ANILCA). 16 U.S.C. §§ 3101-3233 (1988). The superior court denied the motion.
The case proceeded to trial; the jury convicted the Defendants. The court of appeals affirmed. James v. State, Mem. Op. & J. No. 3150 (Alaska App., April 26, 1995). This court granted Defendants' petition for hearing.

III. DISCUSSION

A. The Question Presented Is Whether the United States Owns the Submerged Lands of the Tongass.

The Defendants argue that ANILCA applies to coastal waters within the boundaries of the Tongass, because the United States holds title to the coastal submerged lands, and because ANILCA preempts subsistence fishery regulation by the State.[3] The State responds that ANILCA does not apply to Tongass coastal waters because the State owns the submerged lands and therefore no basis for federal preemption exists. The State also argues, in the alternative, that there was no preemption even if ANILCA applies because the state regulations are consistent with ANILCA.
ANILCA grants to the federal government the authority to regulate subsistence activities on "public lands." 16 U.S.C. § 3114. The term "public lands" is defined by ANILCA as follows:
(1) The term "land" means lands, waters, and interests therein.
(2) The term "Federal land" means lands the title to which is in the United States after December 2, 1980.
(3) The term "public lands" means land situated in Alaska which, after December 2, 1980, are Federal lands, except 
(A) land selections of the State of Alaska which have been tentatively approved or validly selected under the Alaska Statehood Act and lands which have been confirmed to, validly selected by, or granted to the Territory of Alaska or the State under any other provision of Federal law.
16 U.S.C. § 3102. Thus, as we explained in Totemoff v. State, 905 P.2d 954, 962 (Alaska 1995), the term "public lands" in ANILCA "means lands, waters, and interests therein, the title to which is in the United States. But `public lands' does not include lands, waters, interests therein which were transferred to Alaska under other federal laws." Id.
The roe that Defendants possessed was harvested in the Craig-Klawock area of the west coast of Prince of Wales Island. The exterior boundaries of the Tongass in this part of Alaska extend from the international boundary with Canada some 150 miles to the east, to a line approximately 60 miles to the west in the Pacific Ocean. These boundaries were established by a proclamation of President Theodore Roosevelt on February 16, 1909, withdrawing "[a]ll of the public land lying within the boundaries described" and adding them to the Tongass.[4] Proclamation No. 846 (1909). To determine whether ANILCA applies, we must determine whether title to the coastal submerged lands in the Tongass transferred to Alaska at statehood.[5]

*1133 B. Controlling Authorities.

The Defendants contend that the land beneath the coastal waters of the Tongass was reserved to the United States by the 1909 proclamation and was not transferred to the State at statehood. The State contests this. Two cases set out the general principles which govern this case.

1. Utah Lake

The first case is Utah Division of State Lands v. United States, 482 U.S. 193, 107 S.Ct. 2318, 96 L.Ed.2d 162 (1987) (Utah Lake). The issue in Utah Lake was whether title to the bed of Utah Lake  a navigable body of water  passed to the State of Utah upon Utah's admission to the Union, or whether the land remained in federal ownership because it had previously been reserved by the United States Geological Survey as a reservoir site. Id. at 198-99, 107 S.Ct. at 2321-22.
The Court held that title to the lake bed had passed to Utah based on the equal footing doctrine. The Court explained the doctrine with respect to land underlying navigable waters as follows:
When the 13 Colonies became independent from Great Britain, they claimed title to the lands under navigable waters within their boundaries as the sovereign successors to the English Crown. [Shively v. Bowlby, 152 U.S. 1, 15, 14 S.Ct. 548, 553, 38 L.Ed. 331 (1894).] Because all subsequently admitted States enter the Union on an "equal footing" with the original 13 States, they too hold title to the land under navigable waters within their boundaries upon entry into the Union. Pollard's Lessee v. Hagan, 3 How. 212, 11 L.Ed. 565 (1845).
Utah Lake, 482 U.S. at 196, 107 S.Ct. at 2320.
The Court went on to observe that Pollard's Lessee held that the United States held lands under navigable waters in territories "`in trust' for the future States," and that dictum in that case suggested that the equal footing doctrine "absolutely prohibited the United States from taking any steps to defeat the passing of title to land underneath navigable waters to" future states. Id. The Court noted that this dictum has been disavowed, as it was held in Shively v. Bowlby that the federal government has the authority to make a prestatehood conveyance of land under navigable water to a private party "in exceptional instances," in cases of "international duty or public exigency." Utah Lake, 482 U.S. at 196-97, 107 S.Ct. at 2320-21 (quoting Shively, 152 U.S. at 50, 14 S.Ct. at 566). The Court observed that there is "a strong presumption" against such conveyances.
Utah argued in Utah Lake that only a conveyance to a third party and not merely a federal reservation could defeat a state's title to land under navigable waters at statehood. Id. at 200, 107 S.Ct. at 2322-23. The Supreme Court assumed, arguendo, that such federal power exists,[6]id. at 201, 107 S.Ct. at 2323, but held that there was a strong presumption against its use:
Although arguably there is nothing in the Constitution to prevent the Federal Government from defeating a State's title to land under navigable waters by its own reservation for a particular use, the strong presumption is against finding an intent to defeat the State's title.
Id. Drawing on the cases involving prestatehood conveyances to third parties, the Court stated:
Congress, therefore, will defeat a future State's entitlement to land under navigable waters only "in exceptional instances," and in light of this policy, whether faced with a reservation or a conveyance, we simply cannot infer that Congress intended to defeat a future State's title to land under navigable waters "unless the intention was definitely declared or otherwise made very plain."
*1134 Id. at 201-202, 107 S.Ct. at 2323 (quoting United States v. Holt State Bank, 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926)).
The Court noted a difference between prestatehood conveyances to third parties and prestatehood reservations of lands beneath navigable waters. In the former, Congress necessarily intends to defeat the future state's claim to the land. In the latter, however, there may not be such an intent. "The land remains in federal control, and therefore may still be held for the ultimate benefit of future States." Id. at 202, 107 S.Ct. at 2323. In view of this, a two-part inquiry is required: (1) Did Congress clearly intend to include the lands beneath navigable waters within the reservation? (2) Assuming lands beneath the navigable waters were included within the reservation, did Congress clearly express an intention to defeat the future state's claim to the underlying lands? Id.

2. Beaufort Sea

a. Utah Lake's "strong presumption" against defeating future state's title to submerged land applies to coastal submerged land.

There is a distinction between tidelands and coastal undersea lands. Tidelands extend from mean high tide to mean low tide. Coastal undersea lands extend seaward from mean low tide for three miles.[7] Tidelands and inland navigable waters are covered by the equal footing doctrine and are controlled by the Utah Lake decision. United States v. Alaska, ___ U.S. ___, ___, 117 S.Ct. 1888, 1892, 138 L.Ed.2d 231 (1997) (Beaufort Sea). Coastal undersea lands do not pass to the states under the equal footing doctrine. Therefore, the doctrinal basis for Utah Lake's "strong presumption" against defeating a future state's title does not exist as to such lands.
Coastal undersea lands were held in United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), to belong to the United States. In 1953 Congress passed the Submerged Lands Act, which nullified the effect of that decision and "recognized, confirmed, established, and vested in, and assigned to the respective States" title to submerged lands. 43 U.S.C. § 1311(a) (1994).[8] Under the Submerged Lands Act a state receives title to submerged lands unless the United States has "expressly retained" them. 43 U.S.C. § 1313(a) (1994).[9] In Beaufort Sea the Court held that Congress, by enacting the "expressly retained" exception, intended to employ the same standard to lands which pass under the act as that applicable to lands passing under the equal footing doctrine.

b. Application of Utah Lake principles to Alaska.

Beaufort Sea is also important because of how it applied the Utah Lake principles and because it applied them in the context of the Alaska Statehood Act. One of the withdrawals at issue in Beaufort Sea was National Petroleum Reserve No. 4, which was created by executive order in 1923. The boundary of the reserve followed the Arctic "coast line" measured along "the ocean side of the sand-spits and islands forming the barrier reefs and extending across small lagoons from point to point where such barrier reefs are not over three miles off shore." Beaufort Sea, ___ U.S. at ___, 117 S.Ct. at 1907 (quoting Exc. Order No. 3797-A). At issue was whether the reserve included the submerged lands within this boundary, such as tidelands landward of the islands and lands underlying the "small lagoons" and the mouths of rivers and bays. Id.
The State of Alaska argued that these submerged lands were not included within the reserve based on Utah Lake and another United States Supreme case, Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). The Court rejected Alaska's argument in a discussion which is of *1135 central importance to this case. We therefore quote at some length from the Court's opinion. First, the Court explained the Montana and the Utah Lake decisions as follows:
In Montana, the United States, as trustee for the Crow Tribe, sought a declaratory judgment that it owned the riverbed of the Big Horn River and had conveyed a beneficial interest in the submerged lands to the Tribe. The river was located inside the boundaries of the Crow Reservation established by treaty in 1868, but the treaty did not expressly refer to the riverbed. 450 U.S., at 548, 554, 101 S.Ct., at 1249, 1252-1253. Applying the "strong presumption against conveyance by the United States" to defeat a State's title, id., at 552, 101 S.Ct., at 1251, we concluded that the "mere fact that the bed of a navigable water lies within the boundaries described in the treaty does not make the riverbed part of the conveyed land, especially when there is no express reference to the riverbed that might overcome the presumption against its conveyance," id., at 554, 101 S.Ct., at 1252-1253. Even though creation of an Indian reservation could be an "appropriate public purpose" justifying a conveyance of submerged lands, a conveyance of submerged lands beneath the river would not have been necessary for the Government's purpose, because fishing was not important to the Crow Tribe's way of life. Id., at 556, 101 S.Ct., at 1253-1254.
In [Utah Lake], the Court found that the United States had not prevented the bed of Utah Lake from passing to Utah at statehood. The Sundry Appropriations Act of 1888, 25 Stat. 505, authorized the United States Geological Survey to select "sites for reservoirs and other hydraulic works necessary for the storage and utilization of water for irrigation and the prevention of floods and overflows." Id., at 526. The Survey selected Utah Lake as a reservoir site. 482 U.S., at 199, 107 S.Ct., at 2322. In 1890, when Congress repealed the 1888 Act, it provided "that reservoir sites heretofore located or selected shall remain segregated and reserved from entry or settlement as provided by [the 1888 Act]." Sundry Appropriations Act of 1890, 26 Stat. 391.
In concluding that the 1888 Act did not reflect a clear intent to include submerged lands within lands reserved for reservoir sites, the Court focused in part on the fact that the Act was motivated by concerns that settlers would claim lands suitable for reservoir sites or other reclamation efforts. 482 U.S., at 198, 203, 107 S.Ct., at 2321-2322, 2324. These concerns of "monopolization and speculation" "had nothing to do with the beds of navigable rivers and lakes." Id., at 203, 107 S.Ct., at 2324. Moreover, the Government's ability to control and develop navigable waters would not be impaired if the land beneath the navigable waters passed to the State. Id., at 202, 107 S.Ct., at 2323-2324; see also Arizona v. California, 373 U.S. 546, 597-598, 83 S.Ct. 1468, 1496-1497, 10 L.Ed.2d 542 (1963); Arizona v. California, 283 U.S. 423, 451-452, 457, 51 S.Ct. 522, 524-525, 75 L.Ed. 1154 (1931). We also considered whether certain references to the bed of Utah Lake in reports by the Geological Survey, coupled with the 1890 Act's requirement that selected sites remain segregated, accomplished a reservation of the lakebed. We concluded that the references to the lakebed in the Survey documents, when placed in proper context, did not indicate that the bed was included within the reservation. [Utah Lake], supra, at 206, 107 S.Ct., at 2325-2326. Finally, we held that even if the 1888 or 1890 Acts reflected a clear intent to include submerged lands within a reservation, there was no evidence that the United States intended to defeat future State's entitlement to any land reserved. Again, our analysis focused on the fact that the transfer of title to the lakebed would not prevent the Government from developing a reservoir or water reclamation project at the lake. Id., at 208, 107 S.Ct., at 2325-2327.
Beaufort Sea, ___ U.S. at ___-___, 117 S.Ct. at 1907-08.
The Court then distinguished the Beaufort Sea case from Utah Lake and Montana on the ground that the boundary of the National *1136 Petroleum Reserve explicitly mentioned certain coastal features, whereas the boundaries of the reserves in Montana and Utah Lake merely embraced navigable waters and, most importantly, because the purposes of the reserves in Montana and Utah Lake did not require reservation of submerged lands, whereas the purpose of the National Petroleum Reserve did require the inclusion of submerged lands. The Court stated:

Montana and [Utah Lake] establish that the fact that navigable waters are within the boundaries of a conveyance or reservation does not in itself mean that submerged lands beneath those waters were conveyed or reserved. But Alaska's reliance on these cases is misplaced for two reasons. First, the Executive Order of 1923 does not merely define a boundary that encloses a body of navigable water. Rather, in describing a boundary following the ocean side of offshore islands and reefs, the Order created a Reserve that necessarily embraced certain submerged lands  specifically, tide lands shoreward of the barrier islands. Second, Montana and [Utah Lake] establish that the purpose of a conveyance or reservation is a critical factor in determining federal intent. See also Alaska Pacific Fisheries v. United States, 248 U.S. 78, 87-89, 39 S.Ct. 40, 41-42, 63 L.Ed. 138 (1918) (reservation of "body of lands" in southeastern Alaska for Metlakahtla Indians included adjacent waters and submerged lands, because fishing was necessary for Indians' subsistence). The Executive Order of 1923 sought to retain federal ownership of land containing oil deposits. The Order recited that "there are large seepages of petroleum along the Arctic Coast of Alaska and conditions favorable to the occurrence of valuable petroleum fields on the Arctic Coast," and described the goal of securing a supply of oil for the Navy as "at all times a matter of national concern." Petroleum resources exist in subsurface formations necessarily extending beneath submerged lands and uplands. The purpose of reserving in federal ownership all oil and gas deposits within the Reserve's boundaries would have been undermined if those deposits underlying lagoons and other tidally influenced waters had been excluded. It is simply not plausible that the United States sought to reserve only the upland portions of the area.
Id. at ___-___, 117 S.Ct. at 1908-09 (footnote omitted) (emphasis in original).
In sum, the 1923 Executive Order creating the Reserve reflects a clear intent to include submerged lands within the Reserve. The boundary by its terms embraces certain coastal features, and the Master interpreted it to embrace others. In light of the purpose of the Reserve, it is simply not plausible that the Order was intended to exclude submerged lands, and thereby to forfeit ownership of valuable petroleum resources beneath those lands. The importance of submerged lands to the United States' goal of securing a supply of oil distinguishes this case from Montana and [Utah Lake], where the disputed submerged lands were unnecessary for achieving the federal objectives.
Id. at ___, 117 S.Ct. at 1909.
Having concluded that submerged lands were intended to be included within the National Petroleum Reserve, the Court turned to the second question required under the Utah Lake decision, that is, whether "the United States intended to defeat a future State's title" to the reserved submerged lands. Id. The Court's master had found that in section 11(b) of the Alaska Statehood Act Congress expressed a clear intent to defeat state title, and the Court agreed. Section 11(b) of the Statehood Act provides in part that
authority is reserved in the United States ... for the exercise by the Congress of the United States of the power of exclusive legislation ... in all cases whatsoever over such tracts or parcels of land as, immediately prior to admission of said state, are owned by the United States and held for military, naval, Air Force, or Coast Guard purposes, including naval petroleum reserve numbered 4.
Pub.L. 85-508, 72 Stat. 347. The Court concluded that this language "reflects a clear congressional statement that the United States owned and would continue to own *1137 submerged lands included within the Reserve." Beaufort Sea, ___ U.S. at ___, 117 S.Ct. at 1910.
Beaufort Sea also involved submerged lands within the Arctic National Wildlife Refuge, formerly called the Arctic National Wildlife Range. The application that affected the withdrawal of the range described its boundary as beginning from "the line of extreme low water on the Arctic Ocean" at the Canadian Border and following "westerly along the said line of extreme low water, including all offshore bars, reefs and islands." Id. at ___, 117 S.Ct. at 1914. The Court held that the range included submerged lands encompassed within these boundaries, distinguishing the range from Utah Lake and Montana on grounds similar to the grounds on which the National Petroleum Reserve was distinguished from those cases, namely that the boundary expressly referred to coastal features and that the navigable waters within the boundaries of the range were an important part of the wildlife habitat which the range was designed to protect. Id. at ___-___, 117 S.Ct. at 1914-15.
The Court then addressed the second question required by Utah Lake, whether the United States indicated an intent to defeat the future state's title to the submerged lands included with the range. The Court found such an intent in section 6(e) of the Statehood Act, which reserved from transfer to the state "lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife."[10]Id. at ___-___, 117 S.Ct. 1916-17.

C. The 1909 Reservation Did Not Include Submerged Lands.

With respect to the first Utah Lake inquiry  whether the 1909 withdrawal included submerged lands  the Defendants argue that it did because submerged lands are encompassed within the boundary of the withdrawal. They contend that the term "public lands" has "consistently been held under Alaska law to include `land under water,'" citing United States v. Alaska, 423 F.2d 764, 766 (9th Cir.1970) (Tustumena Lake). Further, they submit that "the intention of creating the Tongass National Forest would be defeated" if submerged lands were not included within the withdrawal. The State contends that submerged lands were not included within the 1909 proclamation, because the proclamation does not "make plain an intention to include submerged lands." The State argues that the term "public lands" does not ordinarily include submerged lands unless another meaning is inferable. The State also contends that the fact that the boundaries of the Tongass encompass submerged lands is in itself unimportant, because the western boundary of the proclamation was drawn as a matter of convenience "in order to easily describe the inclusion of numerous islands and the rugged coastline." Finally, the State submits that the purpose of the withdrawal does not require submerged lands.
With respect to the second Utah Lake question  whether there was a clear intent to defeat a future state's title  the Defendants argue that such an intent was expressed in the proviso in section 6(e) of the Statehood Act excepting the transfer of lands "withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife." The Defendants also argue that "[a]ll lands within the boundaries of the Tongass National Forest had been expressly retained by the United States upon Alaska's statehood and therefore were not granted to the state under the Submerged Lands Act." The State responds that the proviso of section 6(e) of the Statehood Act relied on by the Defendants does not apply, since the Tongass National Forest is not "specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska," nor was it withdrawn as a refuge or reservation for the protection of wildlife. Further, the *1138 State argues that no other provision of the Alaska Statehood Act expressly retains the submerged lands within the boundaries of the Tongass National Forest as property of the United States.
We conclude that the tidelands and lands underlying the coastal waters of the Tongass were conveyed to the State of Alaska at statehood under the equal footing doctrine and the Submerged Lands Act. Our discussion of the points argued by the parties follows.

1. The withdrawal does not require submerged lands for the achievement of its purposes.

Although the submerged lands are included within the exterior boundaries of the Tongass, there is no indication, much less a clear indication, that they were intended to be included within the 1909 Tongass withdrawal. The withdrawal was governed by the Organic Administration Act of June 4, 1897, Ch. 32, Stat. 34 (codified at 16 U.S.C. § 473 et seq). The Organic Administration Act provided in part:
all public lands that may hereafter be set aside and reserved as national forests under said section,[[11]] shall be as far as practicable controlled and administered in accordance with the following provisions. No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States[.]
Ch. 2, § 1, 30 Stat. 34 (codified as amended at 16 U.S.C. § 475). There were thus no more than three purposes justifying a withdrawal: "to improve and protect the forest," "to conserve the water flows, and to furnish a continuous supply of timber."[12]Id. Conveyance of the submerged lands of the Tongass was not necessary to achieve these purposes. Use of coastal waters and tidelands may be necessary or useful to the harvest and transport of timber. However, the transfer of title of the submerged lands and tidelands to the State would not prevent such uses.[13]See Utah Lake, 482 U.S. at 208, 107 S.Ct. at 2326 (transfer of title of the bed of Utah Lake "would not necessarily prevent the federal government from subsequently developing a reservoir or water reclamation project at the lake in any event").[14]

2. The term "public land" in the proclamation referred only to uplands.

The State is correct that generally the term "public land" refers to uplands, *1139 unless the context of its usage otherwise requires a different meaning.[15] The term "public land" as used in the proclamation necessarily has the same meaning as "public lands" has in the Organic Administration Act of 1897, and in the act which it limited, the Creative Act of 1891. Thus even if there is a different and more expansive meaning of public lands in the context of Alaska land law,[16] that meaning could not have been used in the proclamation, for the proclamation would then have exceeded the authority of the act. Further, the term "public lands" in the Creative Act explicitly refers to uplands: the President is authorized to withdraw public lands "wholly or in part covered with timber or undergrowth." Creative Act of March 3, 1891, ch. 561, 26 Stat. 1103 (codified as amended at 16 U.S.C. § 471 (repealed 1976)).

3. The western boundary of the Tongass is a boundary of convenience.

We agree with the State's argument that the western boundary of the Tongass established by the 1909 proclamation is merely a boundary of convenience. It is drawn as it is in order to avoid the difficult task of describing the hundreds of islands and islets which constitute the western Tongass, which extends some 300 miles from Cape Bingham on the north to Cape Munzon on the south. Except as a matter of descriptive convenience, President Roosevelt could have had no conceivable purpose for including, for example, the open ocean 60 miles west of Cape Munzon.
Additionally, ANILCA extended the boundaries of the Tongass National Forest, and yet stated, "But the boundaries of areas added to the ... National Forest Systems shall, in coastal areas not exceed seaward beyond the mean high tide line to include lands owned by the State of Alaska." 16 U.S.C. § 3103. Thus in extending the boundaries of the Tongass, Congress did not intend to include even the tidelands of the Tongass. This reflects Congress' understanding that submerged lands were not included in the original reservation.

4. The second Utah Lake inquiry is moot.

Our conclusion that submerged lands within the Tongass were not withdrawn by the proclamation moots the second Utah Lake question, which is whether there was a clear intent to defeat the future State of Alaska's title to them. We observe, however, that there is nothing in the Statehood Act which clearly expresses such an intent. Section 6(e) of the Statehood Act does not apply, since the Tongass was not withdrawn as a refuge or reservation for the protection of wildlife, nor is it "specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska." Further, we have been cited to no other provision of the Statehood Act, nor to any other act, indicating an intention to withhold from the State title to the submerged lands of the Tongass.

IV. CONCLUSION

Based on the foregoing we conclude that the submerged coastal lands and tidelands within the boundaries of the Tongass are the property of the State of Alaska, and therefore the Defendants' argument that their conduct was governed by ANILCA fails.
AFFIRMED.
BRYNER, J., not participating.

*1140 APPENDIX

NOTES
[1] Herring roe on kelp may be taken under a subsistence fishing permit. 5 AAC 01.730(a). The sale of subsistence herring roe on kelp is prohibited by 5 AAC 01.010(d). The taking of herring roe on kelp for commercial purposes can be conducted only under a permit issued pursuant to 5 AAC 27.055. None of the Defendants had a commercial permit.
[2] Daryl and Loren James each had permits for 32 pounds of herring roe on kelp. Lillian Charles and Embert James had permits for 158 pounds of herring roe on kelp. George James did not have a permit. The permits, including that of Margaret Lauth-Allen, who is not a defendant in this case, permitted a total of 538 pounds. The Defendants were in possession of approximately 1,900 pounds.
[3] The United States has not claimed title to the tidelands or coastal submerged lands of the Tongass. 16 U.S.C. § 3103 (1988). See also Subsistence Management Regulations for Public Lands in Alaska, Subpart A, § ___.3(b)(ii) (Jan. 1997) (Regional Council Review Draft) (subsistence regulations limited to inland waters of Tongass National Forest). This fact does not, however, preclude the Defendants from asserting that the submerged lands are owned by the United States as part of their argument that the State lacks jurisdiction.
[4] The boundaries of the Tongass established by the 1909 proclamation are shown on the appended map.
[5] In Totemoff v. State, 905 P.2d 954 (Alaska 1995), we held, in response to contentions that such waters are "public lands" because of (a) the federal government's navigational servitude or (b) federal reserved water rights, that ANILCA does not apply to navigable waters overlying the coastal sea floor or tidelands owned by the State. In Alaska v. Babbitt, 72 F.3d 698 (9th Cir.1995), the Ninth Circuit held that ANILCA does not apply to navigable waters overlying state lands because of the federal navigation easement but that it does apply to navigable waters overlying state land which are subject to a reserved water right in the federal government. The Defendants here do not claim that the Tongass coastal waters are public lands because of the navigational servitude, nor do they contend that the reserved water rights doctrine applies. Instead, their argument is simply that the United States holds title to the coastal sea floor underlying the water where roe which they possessed was harvested.
[6] The Court resolved this question in favor of the United States in United States v. Alaska, ___ U.S. ___, ___, 117 S.Ct. 1888, 1906, 138 L.Ed.2d 231 (1997) (Beaufort Sea).
[7] In this opinion we refer to both as submerged lands.
[8] The scope of the Submerged Lands Act includes tidelands, land underlying navigable inland waters, and coastal undersea lands. However, the act was not necessary as to the first two categories, for they were already covered under the equal footing doctrine.
[9] The Submerged Lands Act is expressly incorporated in the Alaska Statehood Act, Pub.L. 85-508, § 6(m), 72 Stat. 343 (1958).
[10] In part, section 6(e) of the Statehood Act provides:

All real and personal property of the United States situated in the Territory of Alaska which is specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska ... shall be transferred and conveyed to the State of Alaska by the appropriate Federal agency: ... Provided, That such transfer shall not include lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife....
[11] The section referred to in the Organic Administration Act as "said section" was the Creative Act of March 3, 1891, ch. 561, § 24, 26 Stat. 1103 (codified as amended at 16 U.S.C. § 471 (repealed 1976)). In this act Congress authorized the President to "set apart and reserve ... any State or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as national forests."
[12] In United States v. New Mexico, 438 U.S. 696, 708-09, 98 S.Ct. 3012, 3018-19, 57 L.Ed.2d 1052 (1978), the Court held that improvement and protection of the forest was not a purpose separate from the watershed and timber supply purposes of the act. The Court describes these purposes as "limited" and "relatively narrow."
[13] Nor has it. Extensive logging has occurred on the Tongass since statehood, even though the State's title to the tidelands and submerged lands has not, to date, been challenged by the United States.
[14] Congress passed the Multiple Use Sustained Yield Act of 1960, 74 Stat. 215 (codified at 16 U.S.C. § 528 et seq). This broadened the purposes of the national forests. The 1960 act provides:

It is the policy of Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, wildlife and fish purposes. The purposes of sections 528 to 531 of this title are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in the [Organic Administration Act of 1897].
This act has no effect on this case for Alaska became a state prior to the act, and the act does not purport to enlarge existing withdrawals. See United States v. New Mexico, 438 U.S. 696, 713, 98 S.Ct. 3012, 3020-21, 57 L.Ed.2d 1052 (1978) ("While we conclude that the Multiple-Use Sustained-Yield Act of 1960 was intended to broaden the purposes for which national forests had previously been administered, we agree that Congress did not intend to thereby expand the reserved rights of the United States.").
[15] There is much authority which supports this proposition. E.g., Utah Lake, 482 U.S. at 206, 107 S.Ct. at 2325-26; Mann v. Tacoma Land Co., 153 U.S. 273, 284, 14 S.Ct. 820, 822, 38 L.Ed. 714 (1894).
[16] Although the Ninth Circuit Court of Appeals in Tustumena Lake stated, "In construing the pertinent Alaskan statutes, the courts have consistently held that the words `public domain,' `public lands' and `land,' include land under water," 423 F.2d at 766, the cases cited by the Circuit in Tustumena Lake are not inconsistent with the proposition that the term "public lands" does not ordinarily include submerged lands because an intent was inferable in each of the cases relied on by the Circuit that submerged lands be included.