SCOTT *v.* CAREW.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 52.　Argued November 7, 8, 1904.—Decided January 3, 1905.

Unless an intent to the contrary is clearly manifest by its terms, a statute providing generally for the disposal of public lands is inapplicable to lands taken possession of and occupied by the Government for a special purpose.

A prior appropriation is always presumed to except land from the scope of a subsequent grant although no reference may be made in the latter to the former.

The establishment of a military post under proper orders on public lands amounts to an appropriation of the land for military purposes and withdraws the property occupied from the effect of general laws subsequently passed for the disposal of public lands, and no right of an individual settler attaches to or hangs over the land to interfere with the action of the Government in regard thereto.

One who wrongfully settled on public land and was dispossessed by proper authority so that the land might be used for a military post acquired by such settlement no priority of right in the matter of purchase or homestead entry when the post was abandoned and the land opened to private purchase.

ON December 31, 1900, the plaintiffs, who are now appellants, filed their bill of complaint in the Circuit Court of the

United States for the Southern District of Florida, praying that the defendants, holding the legal title to a tract of land under patent from the United States, be decreed to hold that title in trust for them. A demurrer to the bill was sustained and a decree of dismissal entered. This was affirmed by the Circuit Court of Appeals for the Fifth Circuit, and from that affirmance this appeal was taken.

The averments in the bill are: The plaintiffs are the sole descendants and heirs at law of Robert J. Hackley, who died in 1845. In November, 1823, Hackley, then over twenty-one years of age, and the head of a family, settled upon and cultivated the tract in controversy. At that time the surrounding country was a dense wilderness and he the only settler. He erected on the tract a substantial dwelling and other buildings. In 1824 Colonel Brooke, with a detachment of United States troops, was sent to this portion of Florida, located a camp or cantonment on this tract, dispossessed Hackley, and took possession of the house and land so occupied and cultivated by him. The Secretary of the Interior, in the contest proceedings hereinafter referred to, in an opinion which is attached to the bill as an exhibit, found that this action was taken by order of the War Department. United States troops continued to occupy the camp or cantonment until December 10, 1830, when by an executive order of the President the Fort Brooke military reservation was established, containing sixteen square miles of land and embracing the tract in controversy. Thereafter this military reservation was reduced from time to time by executive orders, until on June 1, 1878, only the tract in controversy, commonly known as the "Reduced Fort Brooke military reservation," remained. On January 4, 1883, it was relinquished, and transferred by the Secretary of War to the Interior Department. Hackley, after his removal from the tract, remained a resident of Florida up to the time of his death. On March 3, 1823, Congress passed an act authorizing the President to establish a land office in each of the districts of East and West Florida as soon as in his

opinion there was a sufficient quantity of public land surveyed to justify it. Under this act and by an executive order in 1828 a land office was established at St. Augustine, in the district in which this land was situate. At the time this office was established the hostility of the Indian tribes was such as to render communication between it and that portion of Florida where Hackley resided practically impossible. But in the year 1835, although the public surveys had not been extended into this part of Florida, Hackley filed with the register of the land office evidence designating the particular tract which had been settled upon, inhabited and cultivated by him as aforesaid, and claimed the right of preëmption and purchase thereof under and by virtue of the act of Congress of April 22, 1826. By change of the boundary lines of the land districts of Florida the land subsequently came within the jurisdiction of the land office at Newnansville, Florida, whereupon on November 27, 1843, Hackley secured from the register of the land office at St. Augustine a copy of the evidence formerly filed in that office, and filed it with a notice of his claim with the register of the office at Newnansville. On September 26, 1887, the administrator of the estate of Hackley filed in the local land office a supplemental notice of the claim of the legal representatives of Hackley to the right of preëmption in the purchase of the tract. Other parties made application to the Land Department for an entry of said lands, contest proceedings were had, which were terminated by a decision of the Secretary of the Interior adverse to the claim of the plaintiffs, and a patent was issued to Edmund S. Carew, under whom the defendants claim.

The following statutes are relied upon by the parties: Act of Congress, March 3, 1807, 2 Stat. 445, section 1 of which provides:

"That if any person or persons shall, after the passing of this act, take possession of, or make a settlement on any lands ceded or secured to the United States, by any treaty made with a foreign nation, or by a cession from any State to the

United States, which lands shall not have been previously sold, ceded, or leased by the United States, or the claim to which lands, by such person or persons, shall not have been previously recognized and confirmed by the United States; or if any person or persons shall cause such lands to be thus occupied, taken possession of, or settled; or shall survey, or attempt to survey, or cause to be surveyed, any such lands; or designate any boundaries thereon, by marking trees, or otherwise, until thereto duly authorized by law; such offender or offenders, shall forfeit all his or their right, title, and claim, if any he hath, or they have, of whatsoever nature or kind the same shall or may be, to the lands aforesaid, which he or they shall have taken possession of, or settled, or cause to be occupied, taken possession of, or settled, or which he or they shall have surveyed, or attempt to survey, or cause to be surveyed, or the boundaries thereof he or they shall have designated, or cause to be designated, by marking trees or otherwise. And it shall moreover be lawful for the President of the United States, to direct the marshal, or officer acting as marshal, in the manner hereinafter directed, and also to take such other measures, and to employ such military force as he may judge necessary and proper, to remove from lands ceded, or secured to the United States, by treaty, or cession as aforesaid, any person or persons who shall hereafter take possession of the same, or make, or attempt to make a settlement thereon, until thereunto authorized by law. And every right, title, or claim, forfeited under this act, shall be taken and deemed to be vested in the United States, without any other or further proceedings."

The other sections have no application to this case.

On February 5, 1813, 2 Stat. 797, the following act was passed:

"That every person, or legal representative of every person, who has actually inhabited and cultivated a tract of land lying in either of the districts established for the sale of public lands, in the Illinois Territory, which tract is not rightfully claimed

by any other person, and who shall not have removed from said Territory; every such person and his legal representatives shall be entitled to a preference in becoming the purchaser from the United States of such tract of land at private sale, at the same price and on the same terms and conditions in every respect, as are or may be provided by law for the sale of other lands sold at private sale in said Territory, at the time of making such purchase: *Provided,* that no more than one-quarter section of land shall be sold to any one individual, in virtue of this act; and the same shall be bounded by the sectional and divisional lines run, or to be run, under the direction of the surveyor general for the division of the public lands: *Provided also,* that no lands reserved from sale by former acts, or lands which have been directed to be sold in town lots, and out lots, shall be sold under this act.

"Sec. 2. *And be it further enacted,* That every person claiming a preference in becoming the purchaser of a tract of land, in virtue of this act, shall make known his claim, by delivering a notice in writing to the register of the land office, for the district in which the land may lie, wherein he shall particularly designate the quarter section he claims; which notice the register shall file in his office, on receiving twenty-five cents from the person delivering the same. And in every case where it shall appear to the satisfaction of the register and receiver of public monies of the land office, that any person, who has delivered his notice of claim, is entitled, according to the provisions of this act, to a preference in becoming the purchaser of a quarter section of land, such person so entitled shall have a right to enter the same, with the register of the land office, on producing his receipt from the receiver of public monies for at least one-twentieth part of the purchase money, as in case of other public lands sold at private sale: *Provided,* that all lands to be sold under this act shall be entered with the register, at least two weeks before the time of the commencement of the public sales, in the district wherein the land lies: and every person having a right of preference in becoming the

purchaser of a tract of land, who shall fail so to make his entry with the register, within the time prescribed, his right shall be forfeited, and the land by him claimed shall be offered at public sale, with the other public lands in the district to which it belongs."

And on April 22, 1826, 4 Stat. 154, Congress passed another act, the first section of which reads as follows:

"That every person, or the legal representatives of any person, who, being either the head of a family, or twenty-one years of age, did, on or before the first day of January, in the year one thousand eight hundred and twenty-five, actually inhabit and cultivate a tract of land situated in the Territory of Florida, which tract is not rightfully claimed by any other person, and who shall not have removed from the said Territory, shall be entitled to the right of preëmption in the purchase thereof, under the same terms, restrictions, conditions, provisions and regulations, in every respect, as are directed by the act, entitled 'An act giving the right of preëmption, in the purchase of lands, to certain settlers in the Illinois Territory,' passed February the fifth, one thousand eight hundred and thirteen: *Provided*, That no person shall be entitled to the provisions of this section, who claims any tract of land in said Territory, by virtue of a confirmation of the commissioners, or by virtue of any act of Congress."

*Mr. Henry W. Anderson* and *Mr. Francis P. Fleming*, with whom *Mr. William H. Lamar*, *Mr. George H. Lamar*, *Mr. Francis P. Fleming, Jr.*, *Mr. Beverley B. Mumford*, *Mr. Eppa Hunton, Jr.*, and *Mr. E. Randolph Williams* were on the brief, for appellants:

Hackley or his legal representatives acquired a right to, or interest in, the land in controversy, by virtue of his settlement thereon and cultivation thereof in 1823, 1824, and their subsequent acts.

In the construction and interpretation of statutes the courts must so construe the law as to effect the object designated by

the Legislature, and to this end its provisions must be examined in the light of surrounding circumstances at the time of their enactment and of preceding history. *Sieman's Adm'r* v. *Sellers*, 123 U. S. 276, 285; *In re Ross*, 140 U. S. 453, 475; *Ross* v. *Borland*, 1 Peters, 654; *Edwards* v. *Darby*, 12 Wheat. 210; *Gibbons* v. *Ogden*, 9 Wheat. 1.

The statutes involved were passed more than seventy-five years ago, when the conditions and circumstances were entirely different from those now existing, or such as have existed for many years past. It is essential, therefore, to review the history and development of the public land system and the legislation bearing thereon. *Smith* v. *Townsend*, 148 U. S. 490; and see Chap. VIII, The History of the Public Domain, Donaldson, 1881.

From the earliest times the relief and protection of the first settlers has been a controlling consideration with every department of the Government; that first the protection and afterwards the encouragement of *bona fide* settlements for the purpose of making a home has been regarded as a most important consideration in the disposition of the public lands— a consideration which finally led to the practical abandonment of the system of sales and the enactment of the preëmption and homestead laws.

Hackley comes within the terms of the act of April 22, 1826. The act is plain in its terms and the court must give it effect. Sutherland, § 234; *United States* v. *Hartwell*, 6 Wall. 395; *United States* v. *Wiltberger*, 5 Wheat. 95. Congress has always protected the early settlers. *Lamb* v. *Davenport*, 18 Wall. 307; *Lytle* v. *Arkansas*, 9 How. 334; *Wynn* v. *Morris,* 16 Arkansas, 414.

The act amounted to a grant *in presenti* to the settler within its terms which could be defeated by the failure to perform conditions subsequent. *United States* v. *Fitzgerald*, 15 Pet. 418; *Barnard* v. *Ashley*, 18 How. 43; *Brown* v. *Clements*, 3 How. 666; *Hall* v. *Pipin*, 24 How. 132; *Bryan* v. *Forsythe*, 19 How. 334; *Morrow* v. *Whitney*, 95 U. S. 551; *Caronditch* v. *St.*

*Louis*, 1 Black, 179; *Glasgow v. Hortiz*, 1 Black, 595; *Savignac v. Garrison*, 18 How. 132.

The act of ·March 3, 1807, does not affect complainants' rights. It did not under the contemporaneous construction of the various preëmption acts by the executive departments of the Government to which the court will give controlling weight. *United States v. Philbrick*, 120 U. S. 52, 59; *Hahn v. United States*, 107 U. S. 405; *Brown v. United States*, 113 U. S. 571; *United States v. Darby*, 12 Wheat. 206; *United States v. Moore*, 95 U. S. 760; 2 Pub. Land Law Inst. & Orders, 272, 422; Cong. Deb. for 1825, 1826,. pp. 1422–1436.

The·act of 1826 did not require that Hackley should be in possession when the act was passed ·or January 1, 1826, but only that he should have—as he had—cultivated it prior to January 1, 1825. The courts will not read a condition into an act which it does not contain. *Newhall v. Sanger*, 92 U. S. 765; *Glasgow v. Hortiz*, 1 Black, 595; *Ryan v. Carter*, 93 U. S. 78; *United States v. Dixon*, 15 Pet. 141 ; *Minds v. United States*, 15 Pet. 423; *United States v. Arredondo*, 5 Pet. 691. Nor make exceptions which the Legislature did not insert in the act. *French v. Spencer*, 21 How. 228; *Yturbide v. United States*, 22 How. 290; *Ross v. Duval*, 13 Pet. 45.

The act of 1826 was wholly retroactive and covered settlements on unsurveyed lands. *Moore v. Robbins*, 96 U. S. 530 536, distinguishing *Atherton v. Fowler*, 96 U. S. 513.

Hackley's ejectment from his settlement by military forces of the United States, and the establishment of a camp thereon, prior to the passage of the act of 1826, did not prevent him from acquiring a right of preëmption in the purchase of the lands.

The temporary occupation of this tract of land by the troops . of the United States in 1826, did not constitute a *claim* to the land at all; and even if it had been claimed, it would not have been within the terms of the act, since it was not a claim by "any other person."

The legal effect of such occupation, if any, is purely a question of law, as to which the courts are in no way bound by the

finding of the Interior Department. *Lee* v. *Johnson*, 116 U. S. 48; *Johnson* v. *Towsley*, 13 Wall. 72; *Johnson* v. *United States*, 2 C. Cl. 391.

There was no order by competent authority nor was the reservation made with such solemnity and publicity as will forever set apart the lands so reserved, so that they cannot be disposed of other than by act of Congress. *Wolsey* v. *Chapman*, 101 U. S. 755; *United States* v. *Tichnor*, 12 Fed. Rep. 421.

The presumption which holds in the case of the Secretary of War, that he is acting as the mouthpiece of the President, does not apply in the case of orders issued by subordinate officers. *Wilcox* v. *Jackson*, 13 Wall. 498; *United States* v. *Stone*, 2 Wall. 537; *Missouri &c. Ry. Co.* v. *Roberts*, 152 U. S. 119; *Wilcox* v. *McConnell*, 13 Pet. 498; 19 Am. & Eng. Ency. of Law, 1st ed., 441; *United States* v. *Fitzgerald*, 15 Pet. 407.

For distinction between mere "occupation" and reservation of public lands, see *Morrow* v. *Whitney*, 95 U. S. 551.

The occupation by the troops could have had no other effect than possibly to delay Hackley's right and did not render the act of 1826 inapplicable to these lands. On the termination of the occupation he was entitled to perfect his interests. *Ham* v. *Missouri*, 18 How. 126; *Beecher* v. *Wetherby*, 95 U. S. 517; *State of Michigan*, 8 L. D. 308; *State of Louisiana*, 17 L. D. 440; *State of Wisconsin*, 19 L. D. 518; *United States* v. *Thomas*, 151 U. S. 577; *Stockbridge* and *Menesee Indians* v. *Wisconsin*, 25 L. D. 17; *State of Florida*, 25 L. D. 117.

The right to perfect the title passed to Hackley's heirs. *Buxton* v. *Traver*, 130 U. S. 232, distinguished.

*Mr. Edward R. Gunby, Mr. Wm. Wade Hampton* and *Mr. Horatio Bisbee* for appellees.

MR. JUSTICE BREWER, after making the foregoing statement of facts, delivered the opinion of the court.

The vital question in this case is whether Hackley could claim the benefit of the act of 1826, in reference to the tract in

controversy. Prior to that act he was wrongfully in possession of the tract, and could have been summarily removed by order of the President. (Act of March 3, 1807.) His dispossession was by authority of law. It was done in the exercise of the power vested in the President as Commander-in-Chief of the Army, the order of the War Department being presumed to be that of the President. The occupation of the tract by the United States troops was rightful, being an occupation of property of the Government by direction of the proper officer, and that rightful occupation continued until the act was passed. It is unnecessary to rest the case upon the clause in the act of 1826, "which tract is not rightfully claimed by any other person," although that is not without significance, or to discuss the question whether the United States can be considered another person. A more substantial reason is to be found in the rule that whenever a statute is passed containing a general provision for the disposal of public lands, it is, unless an intent to the contrary is clearly manifest by its terms, to be held inapplicable to lands which for some special public purpose have been in accordance with law taken full possession of by and are in the actual occupation of the Government. Where particular tracts have been taken possession of by rightful orders of an executive department, to be used for some public purpose, Congress in legislating will be presumed to have intended no interference with such possession nor a sale or disposal of the property to private individuals. Such has been the rule obtaining in the Land Department, as well as in the courts. An early case was *Wilcox* v. *Jackson,* 13 Pet. 498. That case rested upon a claim of right of preëmption under the act of June 19, 1834, 4 Stat. 678, which revived an act passed May 29, 1830, 4 Stat. 420, containing these provisions:

"That no entry or sale of any land shall be made, under the provisions of this act, which shall have been reserved for the use of the United States, or either of the several States in which any of the public lands may be situated," or "which is reserved from sale by act of Congress, or by order of the President, or

which may have been appropriated, for any purpose whatsoever."

It appeared that at the request of the Secretary of War.the Commissioner of the General Land Office had marked upon the official map of that department the tract in controversy as reserved for military purposes, and directed it to be withheld from sale. The court held that this action was that of the President, saying (p. 513):

"Now, although the immediate agent, in requiring this reservation, was the Secretary of War, yet we feel justified in presuming, that it was done by the approbation and direction of the President. The President speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties. Both military posts and Indian Affairs, including agencies, belong to the War Department. Hence, we consider the act of the War Department, in requiring this reservation to be made, as being in legal contemplation the act of the President; and, consequently, that the reservation thus made was, in legal effect, a reservation made by order of the President, within the terms of the act of Congress."

And going beyond the special language of the act in respect to the sale of lands, the court observed:

"But we go further, and say, that whensoever a tract of land shall have been once legally appropriated to any purpose, from that moment, the land thus appropriated becomes severed from the mass of public lands; and that no subsequent law, or proclamation, or sale, would be construed to embrace it, or to operate upon it; although no reservation were made of it.

"The very act which we are now considering will furnish an illustration of this proposition. Thus, in that act, there is expressly reserved from sale the land, within that district, which had been granted to individuals, and the State of Illinois. Now, suppose this reservation had not been made, either in the law, proclamation or sale, could it be conceived that, if that land were sold at auction, the title of the purchaser would

avail against the individuals or State to whom the previous grants had been made? If, as we suppose, this question must be answered in the negative, the same principle will apply to any land which, by authority of law, shall have been severed from the general mass."

In *Leavenworth &c. R. R. Company* v. *United States,* 92 U. S. 733; 745, the doctrine announced in *Wilcox* v. *Jackson, supra,* was reaffirmed, the court, quoting the first paragraph in the last quotation, added "it may be urged that it was not necessary in deciding that case to pass upon the question; but, however this may be, the principle asserted is sound and reasonable, and we accept it as a rule of construction." In that case it was held that a grant of public land in aid of a railroad did not apply to lands included within an Indian reservation, and that it was immaterial that the reservation was afterwards set aside and the lands had become a part of the public lands of the nation. *Newhall* v. *Sanger,* 92 U. S. 761, ruled that lands within the boundaries of an alleged Mexican or Spanish grant which was *sub judice* at the time the Secretary of the Interior ordered a withdrawal of lands along the route of the road, were not embraced by a grant to a railroad company, and it was said in the opinion (p. 763) "the words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws."

In *Shively* v. *Bowlby,* 152 U. S. 1, it was held that while Congress has power to grant lands below high-water mark in navigable waters, yet the fact that the public surveys are made to terminate on the banks or shores of those waters, indicates that such lands are not subject to entry and sale under the general land laws, but so far as they are situated in a Territory are reserved for the use and control of the future State. This doctrine was reaffirmed in *Mann* v. *Tacoma Land Company,* 153 U. S. 273. . Many authorities might be cited to the proposition that a prior appropriation is always understood to except lands from the scope of a subsequent grant, although no refer-

ence is made in the latter to the former. See *Lake Superior &c. Company* v. *Cunningham,* 155 U. S. 354, 373.

There is nothing in *United States* v. *Fitzgerald,* 15 Pet. 407, to conflict with the foregoing views. It merely decided that an officer of the United States (in that case an inspector of customs) was not deprived by any act of Congress of the benefit of the preëmption laws, and the fact that he was put in possession of a tract of land by the collector of customs, who had received no instructions to that effect from the Treasury Department, was not an appropriation to the uses of the Government. It is true a letter from the Acting Commissioner of the General Land Office to the register at New Orleans, stating that the Secretary of the Treasury had directed that the tract be reserved from sale for the use of the custom house at New Orleans, and requesting the register to note upon his plats that it was so reserved from sale, was in evidence, but this was written two years after the inspector had entered and paid for the land. Of course, such attempted reservation could have no effect upon a title acquired by the entryman prior thereto. Nor is there any conflict in *United States* v. *Tichenor,* 12 Fed. Rep. 415. There it appeared that the commanding officer of United States troops in Oregon ordered that a military reservation be established on the tract in controversy. In obedience thereto a lieutenant erected some buildings thereon for the use of the soldiers. It was held by the Circuit Court that such action constituted no appropriation of the land so as to exempt it from the operation of the general land laws. But the ground of the decision was that the general commanding was acting without any direction from the President or the War Department, the court saying (p. 423):

"It may be admitted, as suggested in *Wilcox* v. *Jackson,* 13 Pet. 513, that if the order directing the reservation to be made had been issued by the Secretary of War,—the head of the department through whom the President would speak and act upon the subject,—in the absence of evidence to the contrary, it would be presumed that he acted by the direction

of the President.   But neither General Hitchcock nor Lieutenant Wyman had any authority to designate or establish a reservation at Port Orford for any purpose.   It is not alleged that they were acting in the premises under the authority of the President; and there is no presumption of law that they were."

Again, it is urged that the establishment of this camp or cantonment was a mere temporary matter, and not to be considered as in the nature of a reservation or appropriation, and we are referred to orders and other papers found in the records of the War Department, copies of which appear in the brief of appellants' counsel.   Those orders, if we are permitted to consider them on this demurrer, make distinctly against the contentions of counsel.   We quote from that issued from the Adjutant General's office:

"Order 70.

"Brevet Col. Brooke, with four companies of the Fourth Infantry, will proceed with as little delay as practicable to Tampa Bay, East Florida, where he will establish a military post.   He will select a position with a view to the health and in reference to the Florida Indians about to be removed to that vicinity agreeable to the late treaty.   Upon this point he will consult Col. Gadsden, the commissioner employed in locating the Indians.   .   .   .

"The permanent headquarters of the Fourth Infantry will remain at Cantonment Clinch, and, should Col. Clinch have rejoined his regiment, on the receipt of this order he will be charged with the duty of preparing Col. Brooke's command for the expedition to Tampa.

"By order of Major Gen. Brown.

"E. KIRBY, *Aid-de-Camp.*"

It will be seen that the direction is to "establish a military post."   It was for this "post" that the tract in controversy was taken, and the statement in the report of Colonel Brooke, as one of the reasons for its selection, that some two miles in

the rear of the place a ridge of piney lands commences, to
which the troops could retire with their tents on the slightest
manifestation of disease, does not alter the fact that this tract
was selected for the "post." The further fact that permanent
headquarters of the Fourth Infantry were to remain at Canton-
ment Clinch, is entirely consistent with the direction to
Colonel Brooke to proceed with four companies to Tampa.
Bay and there establish this military post. The judgment
of the War Department, whose action is presumed to be the
action of the President, was that, having reference to the
Florida Indians who were about to be removed to that vicinity,
it was important to have a military post established. Its
permanence would depend largely on the developments of
the future.. It remained a military post for half a century, and
a very large tract was in 1830 set apart for. a surrounding.res-
ervation. True, it has since been all abandoned, but although
it may have been within the contemplation of the authorities
that a time would come when the necessity for this military
post would cease, it was none the less for the time being a
post established by the proper department of the Govern-
ment. It was until the post was abandoned an appropriation
of the land for military purposes. Quite a number of reserva-
tions and posts in our Western territory once established have
afterwards been abandoned, but while so appropriated they
are excepted from the operation of the public land laws, and
no right of an individual settler attaches to or hangs over the
land to interfere with such action as the Government may
thereafter see fit to take in respect to it. No cloud can be
cast upon the title of the Government—nothing done by an
individual to embarrass it in the future disposition of the
land.

Without considering, therefore, the question of laches or
limitation we are of opinion that the decision of the Court of
Appeals was correct, and it is

*Affirmed.*