## NORTHERN PAC. RY. CO. v. MITCHELL.

### (District Court, E. D. Washington, N. D. January 10, 1913.)

#### No. 1,539.

1. PUBLIC LANDS (§ 92*)—RESERVATION FROM SALE—WHAT CONSTITUTES.

A recommendation by an inspector of the Indian Department in a report to the Commissioner of Indian Affairs that a tract of land be set apart for certain Indians was not a reservation of such tract from sale or other disposition, so as to prevent a railroad company locating its line on such tract under a grant of a right of way across public lands, since, while the power vested in Congress by Const. art. 4, § 3, to dispose of and make all needful rules and regulations respecting the territory belonging to the United States, has in some cases been delegated to the President, and, if exercised by the head of an executive department, might be presumed to have been exercised by the President's direction, it has not been delegated to other subordinate officers of the government, and their acts without authorization from the President or from Congress are ineffectual for any purpose, and, moreover, such inspector did not attempt to reserve such land from sale or other disposition.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 276–282; Dec. Dig. § 92.*]

2. UNITED STATES (§ 31*)—EVIDENCE (§ 83*)—EXECUTIVE DEPARTMENTS—PRESUMPTIONS AS TO ACTS.

The President may act through the heads of the different departments, and where the head of a department acts, it will be presumed, in the absence of evidence to the contrary, that he acted by direction of the President.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 19; Dec. Dig. § 31;* Evidence, Cent. Dig. § 105; Dec. Dig. § 83.*]

3. PUBLIC LANDS (§ 92*)—RESERVATION FROM SALE—EFFECT.

An order of the President, reserving certain public lands from sale or other disposition, was ineffectual as against a railroad company, which had already, prior to such order, acquired title to such land by locating its line of road thereon under a grant from Congress of a right of way across the public land.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 276–282; Dec. Dig. § 92.*]

4. PUBLIC LANDS (§ 92*)—RESERVATION FROM SALE—WHAT CONSTITUTES.

An order of a brigadier general in command of a department of the army, reciting that, in consequence of a promise made by an inspector of the Interior Department to have a certain tract of land set aside for certain Indians, the Indians were expecting an executive order to that effect, and therefore directing that, in order to preserve the peace until the pledge of the government should be fulfilled, or other arrangements accomplished, such tract, until surveyed, or until further instructions, should be protected against settlement by other than such Indians, did not reserve such tract from sale or other disposition, so as to prevent a railroad company locating its line of road thereon under a grant from Congress of a right of way, since under Rev. St. § 463 (U. S. Comp. St. 1901, p. 262), the Commissioner of Indian Affairs has the management of all Indian affairs and all matters arising out of Indian relations, under the direction of the Secretary of the Interior, and subject to such regulations as the President may prescribe, and it was therefore unlikely that the War Department would attempt to establish an Indian reservation or reserve lands for that purpose, the order showed plainly on its face that it was a temporary emergency order, and moreover, while the court might presume that the head of a department acted by direction of

the President, in the absence of evidence to the contrary, it could not so presume with regard to other civil and military officers, of whatever grade.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 276–282; Dec. Dig. § 92.*]

At Law. Action by the Northern Pacific Railway Company against Dennis Mitchell. Judgment for plaintiff.

E. J. Cannon, of Spokane, Wash., for plaintiff.

Oscar Cain, U. S. Atty., of Spokane, Wash., for defendant.

RUDKIN, District Judge. This is an action in ejectment to recover a quarter section of land lying in an odd section within the limits of what was heretofore known as the Spokane Indian reservation, and also within the limits of the grant to the Northern Pacific Railroad Company, under the Act of Congress of July 2, 1864 (13 Stat. 365, c. 217).

Inasmuch as the rights of the parties depend upon the solution of a single question, an extended statement of the facts in the case is at this time deemed immaterial. It is conceded that the plaintiff is the owner in fee of the land, and is entitled to recover unless the land was *reserved* when its predecessor in interest filed the map of definite location of its road, opposite this land, in the office of the Commissioner of the General Land Office on the 4th day of October, 1880. The defendant, who is a homesteader on the land, and who is defending through the United States attorney for this district, claims that the land was reserved at the date of the filing of the map of definite location by reason of the following recommendations and orders:

[1] 1. On the 23d day of August, 1877, E. C. Watkins, an inspector of the Indian Department, made a report to the Commissioner of Indian Affairs containing the following recommendations:

"The Spokans wanted a separate reservation along the Spokan river, but, with the contemplated plan of consolidating Indians, and reducing reservations, in my mind, as also the fact of much of the best land along the Spokan river, being already in the possession of the whites, I could not favor it. But after much talk, and full description of the country, given by white men, and Indians familiar with it, I decided to recommend that a piece of land lying north of the Spokan, near its mouth, about twenty miles square, be set apart for the Spokan Patonse, and other roaming Indians of the vicinity. The description is as follows: Beginning at the mouth of the Nomchin creek; thence easterly, to the source of the Chamokane creek; thence down the Chamokane to the Spokan river; thence down the Spokan river to the Columbia; thence up the Columbia to the place of beginning. There are no white settlers living on this tract, and it is a central point for the Indians, proposed to be placed on it, adjacent to the present Colville reserve and forming the proposed addition, and a suitable place for a permanent Indian reserve. It has natural boundaries, is not large, but has a fair proportion of arable land, enough to furnish a farm to every Indian, and is entirely satisfactory to the Lower Spokans, and many of the Upper band, and the Patonse Indians. All these gave me their written promise to remove to this location by the 1st of November next. (I inclose the agreement with this report.)"

On the 3d day of September, 1880, Brigadier General Howard, of the Department of the Columbia, made the following special order:

"Headquarters Department of the Columbia.

"In the Field, Spokane Falls, W. T., September 3, 1880.

"Special Field Orders. No. 8.

"Whereas, in consequence of a promise made in August, 1877, by R. C. Watkins, inspector of the Interior Department, to set apart, or have set apart, for the use of the Spokane Indians, the following described territory, to wit: Commencing at the mouth of the Cham-a-kane creek; thence north eight miles in direction of said creek; thence due west to the Columbia river; thence along the Columbia and Spokane rivers to the point of beginning—the Indians are still expecting the executive order in their case, and are much disturbed by the attempts of squatters to locate land within said limits; it is hereby directed that the above described territory, being still unsurveyed, be protected against settlement by other than said Indians, until the survey shall be made, or until further instructions. This order is based upon plain necessity to preserve the peace until the pledge of the government shall be fulfilled, or other arrangements accomplished. The commanding officers of Forts Cœur d'Alene and Colville and Camp Chelan are charged with the proper execution of this order.

"By command of Brigadier General Howard:

"H. H. Pierce,
"1st Lieutenant, 21st Infantry,
Acting Aide-de-Camp.

"Official:

"H. H. Pierce, Acting Aide-de-Camp."

On the 18th day of January, 1881, the President of the United States made the following order:

"Executive Mansion, January 18, 1881.

"It is hereby ordered that the following tract of land situated in Washington territory be, and the same is hereby, set aside and reserved for the use and occupancy of the Spokane Indians, namely: Commencing at a point where Chemekane creek crosses the forty-eighth parallel of latitude; thence down the east bank of said creek to where it enters the Spokane river; thence across said Spokane river westwardly along the southern bank thereof to a point where it enters the Columbia river; thence across the Columbia river northwardly along its western bank to a point where said river crosses the said forty-eighth parallel of latitude; thence east along said parallel to the place of beginning.     R. B. Hayes."

Before taking up these several recommendations and orders, it may not be out of place to inquire briefly into the source of the power to reserve public lands of the United States from sale or other disposition. This power is vested in Congress by article 4 of section 3 of the Constitution of the United States. The power thus conferred may doubtless be exercised by legislative act or by treaty, and it may also be delegated to the President by Congress, as has been done in numerous instances. Thus in Grisar v. McDowell, 6 Wall. 363, 381 (18 L. Ed. 863), the court said:

"But, further than this, from an early period in the history of the government it has been the practice of the President to order, from time to time, as the exigencies of the public service required, parcels of land belonging to the United States to be reserved from sale and set apart for public uses. The authority of the President in this respect is recognized in numerous acts of Congress. Thus, in the Pre-emption Act of May 29, 1830, it is provided that the right of pre-emption contemplated by the act shall not 'extend to any land which is reserved from sale by act of Congress, or *by order of the President,* or which may have been appropriated for any purpose whatever.' Again, in

the Pre-emption Act of September 4, 1841, 'lands included in any reservation by any treaty, law, or *proclamation of the President* of the United States, or reserved for salines or for other purposes,' are exempted from entry under the act. So by the act of March 3, 1853, providing for the survey of the public lands in California, and extending the pre-emption system to them, it is declared that all public lands in that state shall be subject to pre-emption, and offered at public sale, with certain specific exceptions, and among others 'of lands appropriated under the authority of this act. or *reserved by competent authority*.' The provisions in the acts of 1830 and 1841 show very clearly that by 'competent authority' is meant the authority of the President, and officers acting under his direction."

[2] It is also well settled that the President may act through the heads of the different departments, and if the head of one of the executive departments acts it will be presumed, in the absence of evidence to the contrary, that he acted by direction of the President. Wilcox v. Jackson, 13 Pet. 513, 10 L. Ed. 264; Scott v. Carew, 196 U. S. 100, 25 Sup. Ct. 193, 49 L. Ed. 403.

But, so far as I am advised, no such power has been delegated to other subordinate officers of the government, whether civil or military, and the acts of such officers, without authorization from the President or from Congress, are ineffectual for any purpose.

Let us return, now, to the report of Inspector Watkins. It does not appear that that officer had any authority, except such as his official title might import. He could not establish Indian reservations, or reserve public lands from sale or other disposition, and did not attempt to do so. No action was taken upon his report by his superior officers, except by letter of the Commissioner of Indian Affairs transmitting the report to the Secretary of the Interior, and by letter of the latter transmitting the report to the Senate, in obedience to a resolution of that body, copies of which follow:

"Department of the Interior, Office of Indian Affairs.

"Washington, January 22, 1878.

"Sir: I have the honor to submit herewith a copy of the report of Inspector E. C. Watkins, dated November 26, 1877, concerning the consolidation of the Indians of Oregon and Washington Territory, together with copy of letter of November 24, from G. A. Henry, special Indian agent at the Quinaielt Agency, Washington Territory. I entertain no doubt of the advisability of consolidating these Indians. I am clearly of the opinion, however, that it will be unwise policy to encourage those Indians who are now farming to remain in their present locations. They should all be consolidated upon the reservation selected, and the title, which may be given to them in severalty, should be made inalienable. The experience which has heretofore attended the granting of individual titles to Indians in localities where they are surrounded by the whites, versed in all the machinations by which the Indians are systematically circumvented and ruined in property and discouraged in civilization, compels me to disapprove of so much of Inspector Watkins' recommendation as is included in brackets on pages —— and —— of said copy of his report. Such consolidation, accompanied with individual proprietorship, would relieve the country outside of their presence, and would enable the government to exercise a system of direct protection, education, and civilization, of which the Indians are in imperative need, and without which their general improvement cannot be anticipated. With these brief suggestions, and except as above stated, I heartily recommend the speedy adoption of the proposed plan.

"Very respectfully, your obedient servant,

"E. A. Hayt, Commissioner.

"Hon. Secretary of the Interior."

"Department of the Interior.

"Washington, January 23, 1878.

"Sir: In compliance with the terms of a resolution of the Senate, adopted January 15, 1878, I transmit herewith a copy of the report of Indian Inspector E. C. Watkins, dated November 26, 1877, relative to the establishment of a large Indian reservation or territory in the Colville country, for the use and occupation of a portion or all reservation Indians now on the various reservations in the state of Oregon and in the territory of Washington. I inclose also a copy of a letter addressed to me by the Commissioner of Indian Affairs on the 22d instant, forwarding a copy of said report, and recommending the adoption, in part, of the plan of the inspector. I am of opinion that the proposed consolidation of agencies will be of advantage both to the government and to the Indians, and I respectfully suggest such appropriate legislation by Congress as will enable the department to carry it into effect.

"I have the honor to be, sir, with great respect, your obedient servant,

"C. Schurz, Secretary of the Interior.

"The Vice President."

In so far as this report and the action taken thereon is concerned, it seems manifest, therefore, that the lands in question were not reserved by Congress or by competent authority at the time of the filing of the map of definite location.

[3] 2. We will next take up, out of order, the executive order of President Hayes. It will be at once conceded that this order reserved the lands therein described, if public lands of the United States at that time; but title had vested in the railroad company some months prior to the date of the order, and it was without the power of the President to divest that title or affect the status of the land in any way. Scott v. Carew, supra.

[4] 3. The chief, if not the sole, reliance of the attorney for the government on the argument was the order of Brigadier General Howard. It seems to me there are several insuperable objections to this view:

First. The Commissioner of Indian Affairs had the management of all Indian affairs and of all matters arising out of Indian relations, under the direction of the Secretary of the Interior, and subject to such regulations as the President might prescribe, at the time this order was made (R. S. U. S. § 463 [U. S. Comp. St. 1901, p. 262]), and it is far from likely that the Secretary of War would attempt to establish an Indian reservation or reserve lands for that purpose, as such action on his part would be a plain encroachment on the prerogatives of another department of the government.

Second. The order of Brigadier General Howard shows very plainly on its face that it was a temporary emergency order, made by him on his own responsibility, by virtue of his authority as an army officer to maintain peace among the Indians.

And, lastly, although the court will presume that the head of a department acts by direction of the President, in the absence of evidence to the contrary, this presumption does not extend down the line to all civil and military officers of the government of whatever grade. The effect of a similar order was considered by Judges Sawyer and Deady of the Circuit Court for this Circuit in United States v. Tich-

enor (C. C.) 12 Fed. 415, and in answer to the contention now made the court said:

"It may be admitted,. as suggested in Wilcox v. Jackson, 13 Pet. 513 [10 L. Ed. 264], that if the order directing the reservation to be made had been issued by the Secretary of War, the head of the department through whom the President would speak and act upon the subject, in the absence of evidence to the contrary, it would be presumed that he acted by the direction of the President. But neither Gen. Hitchcock nor Lieut. Wyman had any authority to designate or establish a reservation at Port Orford for any purpose. It is not alleged that they were acting in the premises under the authority of the President, and there is no presumption of law that they were. It may also be admitted that Gen. Hitchcock could direct his subaltern, engaged in military operations in Oregon, to establish and occupy a camp or fort on the public lands therein, or that the latter might do so under the circumstances without any direction from the former. But such use or occupation would not have the effect to impart any special character to the land, or constitute it a reservation for any purpose, within the purview of the donation act. It would still remain open to the claim of any qualified settler under the act, and as soon, at least, as the camp or post was removed or abandoned by the military force, might be actually occupied by any such settler."

The above language was quoted by the Supreme Court of the United States with apparent approval in Scott v. Carew, supra.

For the foregoing reasons, I am of opinion that the land in controversy was not reserved by Congress or by competent authority at the time the Northern Pacific Railroad Company filed its map of definite location of its line opposite thereto, and if I am correct in this conclusion the plaintiff is entitled to recover. Let a judgment be entered accordingly.

NOTE.—The court was in error in stating that the report of Inspector Watkins, dated Lewiston, Idaho, August 23, 1877, was transmitted by the Commissioner of Indian Affairs to the Secretary of the Interior and by the latter to the Senate, because there is no evidence before the court that any action whatever was taken on that report. The report referred to in the letters of the Commissioner and Secretary was a later one, made at Washington City under date of November 26, 1877. This error, however, in no wise affects the conclusion of the court on the merits of the case.