**JUSTHEIM et al.   v.   McKAY et al.**
Civ. No. 4172–49.

United States District Court
District of Columbia.
June 10, 1954.

Clair M. Senior, Salt Lake City, Utah, Melville Ehrlich, Washington, D. C., for plaintiffs.

Ralph S. Boyd, Victor A. Altman, Attys., Dept. of Justice, Washington, D. C., for defendant.

Albert Noble McCartney, Washington, D. C., for intervenors.

Hugh Fullerton, Pillsbury, Madison & Sutro, Washington, D. C., William W. Clark, Stockton, Cal., O'Melveny & Myers, Los Angeles, Cal., Hugh Fullerton, Pillsbury, Madison & Sutro, William W. Clary, O'Melveny & Myers, Los Angeles, Cal., of counsel for intervenors.

McLAUGHLIN, District Judge.

Between April 1, 1938 and August 11, 1947, the Plaintiffs filed fifty applications for oil and gas prospecting permits or leases, under the provisions of the Mineral Leasing Act of February 25, 1920,[1] as amended, the pertinent parts of which are set forth in the margin.[2]   The lands

1.  41 Stat. 437, as amended, 30 U.S.C.A. § 181 et seq.

2.  "An Act To promote the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain.
  "Sec. 1.   That deposits of coal, phos-

phate, sodium, oil, oil shale, or gas, and lands containing such deposits owned by the United States, including those in national forests, but excluding lands acquired under the Act known as the Appalachian Forest Act, approved March 1,

covered by these applications were submerged coastal lands, lying below the low tide line off the California Coast.

An opinion of the Solicitor of the Department of the Interior, dated August 8, 1947,[3] held that the Mineral Leasing Act did not authorize the issuance of oil and gas leases on submerged coastal areas below low tide off the shores of the United States. The opinion of the Solicitor was based on the following grounds (1) the Mineral Leasing Act is a statute

for the disposition of public lands, but lands located below the high water mark, are not now and never have been considered public lands of the United States, (2) lands affected by the Act are to be surveyed and described by legal subdivisions of the public land surveys and these surveys have not heretofore extended beyond the high tide line, (3) since there had been no judicial determination that these lands belonged to the United States at the time of passage of the Act nor at

1911, (Thirty-sixth Statutes, page 961), and those in national parks, and in lands withdrawn or reserved for military or naval uses or purposes, except as hereinafter provided, shall be subject to disposition in the form and manner provided by this Act to citizens of the United States * * *.

"Sec. 13. That the Secretary of the Interior is hereby authorized, and directed, under such necessary and proper rules and regulations as he may prescribe, to grant to any applicant qualified under this Act a prospecting permit, which shall give the exclusive right, for a period not exceeding two years, to prospect for oil or gas upon not to exceed two thousand five hundred and sixty acres of land wherein such deposits belong to the United States and are not within any known geological structure of a producing oil or gas field * * *.

"Provided, That said application was filed ninety days prior to the effective date of this amendatory Act. * * * No prospecting permit shall be granted upon any application filed after ninety days prior to the effective date of this amendatory Act. * * *: Provided, That all permits outstanding on the effective date of this amendatory Act, which on said date shall not be subject to cancelation for violation of the law or operating regulations and which have theretofore been extended by the Secretary of the Interior, shall be, and the same are hereby, extended until December 31, 1937, subject to the applicable conditions of such prior extensions * * *. Whether the lands sought in any such application and permit are surveyed or unsurveyed the applicant shall, prior to filing his application for permit, locate such lands in a reasonably compact form and according to the legal subdivisions of the public-land surveys if the land be surveyed; and in an approximately square or rectangular tract if the land be an unsurveyed tract, * * * and if he shall cause to be erected upon the land

for which a permit is sought a monument not less than four feet high, at some conspicuous place thereon, and shall post a notice in writing on or near said monument, stating that an application for permit will be made within thirty days after date of posting said notice, * * * he shall during the period of thirty days following such marking and posting, be entitled to a preference right over others to a permit for the land so identified. The applicant shall, within ninety days after receiving a permit, mark each of the corners of the tract described in the permit upon the ground with substantial monuments, so that the boundaries can be readily traced on the ground, and shall post in a conspicuous place upon the lands a notice that such permit has been granted and a description of the lands covered thereby: * * * Provided further, That any application for any prospecting permit filed after ninety days prior to the effective date of this amendatory Act shall be considered as an application for lease under Section 17 hereof: * * *.

"Sec. 14. That upon establishing to the satisfaction of the Secretary of the Interior that valuable deposits of oil or gas have been discovered within the limits of the land embraced in any permit, the permittee shall be entitled to a lease for one-fourth of the land embraced in the prospecting permit: * * * The permittee shall also be entitled to a preference right to a lease for the remainder of the land in his prospecting permit * * *.

"Sec. 17. All lands subject to disposition under this Act which are known or believed to contain oil or gas deposits, except as herein otherwise provided, may be leased by the Secretary of the Interior after the effective date of this amendatory Act, to the highest responsible qualified bidder by competitive bidding under general regulations. * * *"

3. Opinion M-34985.

the time of the amendatory Act of August 8, 1946,[4] it could not be assumed that Congress intended to subject these lands to the provisions of the Act.

On the basis of the Solicitor's opinion the applications of Plaintiffs were denied by the Director of the Bureau of Land Management, Department of the Interior. Plaintiffs filed appeals with the Department with respect to each of the applications which had been rejected by the Director. In a series of decisions officials of the Department affirmed the decisions of the Director of the Bureau of Land Management.

Plaintiffs then instituted the present action which seeks review of the decisions of the Department of the Interior and a declaratory judgment as to whether the Mineral Leasing Act applies to the submerged coastal lands, also an injunction directing the Defendant to revoke the rejections of the applications and to reinstate these applications and to cause each of them to be considered on its merits under the provisions of the Mineral Leasing Act.

Jurisdiction was invoked upon the ground of diversity of citizenship and on the further ground that the interpretation of a Federal Statute is involved, also under the general equity jurisdiction of the Court, under the Declaratory Judgment Act,[5] and under Section 10 of the Administrative Procedure Act.[6] The requisite jurisdictional amount was also pleaded.

Pursuant to a motion to intervene the Signal Oil and Gas Company and the Southwest Exploration Company were granted leave to intervene as parties defendant in this action. These intervenors are producing oil companies which originally operated under a lease from the State of California. Since the decision in United States v. California,[7] they have been operating under the joint authority and supervision of the Secretary of the Interior and State officials, pursuant to a stipulation entered by the Attorneys General of the United States and California, pending the establishment of the dividing line between the marginal sea and the inland waters of the State.

Interpretation of the Mineral Leasing Act is the first issue before the Court. The contention of Plaintiffs is that Congress did not intend to use the term "public domain" in the title of the Act in the restrictive meaning of lands subject to sale or other disposal under general land laws. They argue that the scope of the Act is determined by the language of Section 1, "deposits * * and lands containing such deposits owned by the United States", thus making all lands or deposits owned by the United States, with the exception of those areas specifically excluded by this section, subject to the provisions of the Act. Defendant relies on the interpretation of the Interior Department Solicitor, i. e., only public lands of the United States, or those deposits reserved to the United States when the surface of public lands was patented to individuals, are subject to the Act.

Public domain, the term used in the title of the Mineral Leasing Act, has been held equivalent to the term public land.[8] Public lands have been generally defined as those lands of the United States which are subject to sale or other disposal under general laws.[9] Not all lands of the United States are classified as public lands. Lands to which rights have attached and become vested through full

4. 60 Stat. 950, 30 U.S.C.A. § 181.

5. Act of June 14, 1934, 48 Stat. 955, 28 U.S.C. § 2201 et seq.

6. Act of June 11, 1946, 60 Stat. 237, 5 U.S.C.A. § 1009.

7. 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889.

8. Barker v. Harvey, 181 U.S. 481, 490, 21 S.Ct. 690, 45 L.Ed. 963.

9. "The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws". Newhall v. Sanger, 92 U.S. 761, 763, 23 L.Ed. 769. " * * * by 'public land,' as it has been long settled, is meant such land as is open to sale or other disposition under general laws." Bardon v. Northern Pacific R. Co., 145 U.S. 535, 538, 12 S.Ct. 856, 857, 36 L.Ed. 806.

compliance with an applicable land law are no longer part of the mass of public lands,[10] nor are lands which have been reserved or appropriated for some lawful public purpose,[11] i. e., National Parks, Military and naval reservations, etc.

The goal in interpreting this Act, as with any other statute, is to determine the true intent and object of the legislature in the enactment.[12]

Mr. Justice Reed, in United States v. American Trucking Associations, supra, a comprehensive opinion dealing with statutory construction, said at page 542–544 of 310 U.S., at page 1063 of 60 S.Ct.:

"In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress. There is no invariable rule for the discovery of that intention. To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute, * * *. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' "

The legislative history of the Mineral Leasing Act taken in connection with the conditions which prevailed at that time is indicative of the intent of Congress when it enacted this legislation.

The placer mining law [13] was the only method of entering and locating on public lands containing minerals until the year 1909. Under that system the claimant was entitled to a patent giving him title to all minerals. Since the aim of the Government was to facilitate the development of the public domain it was very liberal in disposing of its public lands, including mineral lands. When the program for conservation of the natural resources of the nation was instituted in the early years of this century, it was realized that if disposal of the public domain mineral lands continued at the pace which then prevailed all mineral lands would be in private ownership within a short time, and the Government would be obliged to purchase the valuable minerals which it had practically given away. In order to prevent such an occurrence a Presidential proclamation of September 27, 1909, withdrew large areas of mineral lands from entry and location "in aid of proposed legislation affecting the future use and disposition of petroleum deposits in the public domain". Because there was considerable doubt as to the President's authority to make such a withdrawal, Congress passed the Pickett Act [14] which authorized the President in his discretion to "withdraw from settlement, location, sale, or entry any of the public lands". Orders issued pursuant to the Act withdrew additional vast areas of the public lands which were believed to contain minerals, from entry and location.

As a result of these withdrawals the lands and the minerals which they contained remained the property of the nation. The Government was still anxious that both lands and minerals be developed but desired to establish an intelligent, long-range plan which would provide de-

10. Payne v. Central Pacific Railway Co., 255 U.S. 228, 237, 41 S.Ct. 314, 65 L.Ed. 598.

11. Leavenworth, L. & G. R. Co. v. U. S., 92 U.S. 733, 745, 23 L.Ed. 634; United States v. Minnesota, 270 U.S. 181, 206, 46 S.Ct. 298, 70 L.Ed. 539; Scott v. Carew, 196 U.S. 100, 114, 25 S.Ct. 193, 49 L.Ed. 403.

12. Minor v. Mechanics' Bank, 1 Pet. 46, 64, 7 L.Ed. 47; United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; United States v. N. E. Rosenblum Truck Lines, Inc., 315 U.S. 50, 53, 62 S.Ct. 445, 86 L.Ed. 671.

13. Act of July 9, 1870, 16 Stat. 217, Rev. Stat. § 2332, 30 U.S.C.A. § 38.

14. Act of June 25, 1910, 36 Stat. 847, 43 U.S.C.A. § 141.

velopment and at the same time protect the interests of the nation. In pursuance of this objective two bills [15] were introduced in the 63rd Congress. The purpose of one was to open the withdrawn lands to entry but to reserve all minerals to the United States when a patent was issued. This bill was enacted into the Surface Patent Act.[16] The other bill set out a plan for the exploration and disposition of the minerals reserved to the United States, through a leasing program which would reserve a royalty to the United States. It is obvious from the legislative history of the Act that it was intended to apply only to the mineral fuels and mineral fertilizers in the public lands. The House Report [17] on this bill and the Senate Report [18] both contain statements which made it clear that Congress intended it to be applicable only to public lands.

This bill, although it failed of enactment, set a model for bills [19] which were introduced in succeeding Congresses. There are found in the legislative histories of all these bills expressions that the bills are intended to apply to minerals located in public lands or those minerals reserved when the public lands were patented to individuals.[20]

The Mineral Leasing Act was finally enacted in 1920 and in its final form it was quite similar to the earlier bills. During consideration of the bill there were several statements [21] which reflect the fact that Congress intended it to apply only to the public land minerals. In the House Report on the bill it was made unmistakably clear that this was the intention of the bill.[22]

There are also several administrative interpretations of this Act available to the Court as aids to construction. While the interpretation of an Act of Congress by those charged in large measure with administering the Act is not conclusive, it is nevertheless entitled to persuasive weight.[23]

In 1924 Attorney General Stone considered the question whether the Act was applicable to Executive Order Indian Reservations. In concluding that the Act was limited to public lands and did not extend to all lands owned by the United States so as to include land reserved for Executive Order Indian Reservations, the Attorney General said:

15. H.R. 15036; H.R. 16136, 63rd Congress, 2nd Session.

16. Act of July 17, 1914, 38 Stat. 509, 30 U.S.C.A. §§ 121–123.

17. "This mineral leasing bill affords a method of leasing, on a royalty basis, the deposits of mineral fuels and mineral fertilizers, the 'public-utility' minerals, contained in the public lands of the United States". H.Rep. 668, 63rd Cong. 2nd Session.

18. "Its object was to unlock and facilitate the production and disposition, as needed for use by the demands of trade and consumption, the deposits on public lands of coal, phosphate, oil, gas, * * *. Our present laws for the extraction of those articles from public lands are notoriously lame, inefficient, and inadequate, and badly need revision. The object of the act is to accomplish that." Sen.Rep. 947, 63rd Cong. 3rd Session.

19. H.R. 406, 64th Cong.; H.R. 3232, 65th Cong.; S. 2812, 65th Cong.

20. H.Rep. 17 parts 1 and 2, 64th Cong.; Sen.Rep. 319, 64th Cong.; H.Rep. 206, 65th Cong.; H.Rep. 563, 65th Cong.; Sen.Rep. 116, 65th Cong.

21. 58th Cong.Rec. 4111, 7509.

22. "The present Senate bill, as well as the House draft above referred to, has advanced the conservation theory to the extent that no mineral deposits or lands containing the same, covered by the Act, shall be granted in fee to any applicant, * * * but in all cases the same shall be held under lease from the Government under designated royalties * * *. We have therefore reached the point where all remaining mineral deposits in the *public lands* covered by the Act are retained in Government ownership, subject to lease * * *" (emphasis supplied) H.Rep. 398, 66th Cong. 1st Session.

23. United States v. American Trucking Associations, supra; Billings v. Truesdell, 321 U.S. 542, 553, 64 S.Ct. 737, 88 L. Ed. 917; Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124; United States v. Public Utilities Commission, 345 U.S. 295, 315, 73 S.Ct. 706, 97 L.Ed. 1020.

"It is obvious that the words of inclusion and the words of exclusion, taken together, do not by any means embrace all the lands 'owned by the United States'."

34 Op.Atty.Gen. 171, 173.

Attorney General Jackson in concluding that the Mineral Leasing Act did not authorize the issuance of leases on lands acquired by the War Department for its Flood Control program, said:

"* * * It would have been rather unusual, in fact, to ignore what probably seemed to be the most obvious thing about the statute (suggested by the language of the section under consideration, unqualifiedly stated in the title, indicated by its legislative history and by prior decisions under this statute and earlier ones), namely, that it had peculiar application to the public domain, and that upon this consideration alone could its language (particularly its inclusions and exclusions) be explained as in accord with what one might expect as rational."

40 Op.Atty.Gen. 9, 13.

██ In view of the foregoing delineation of the circumstances which prompted the enactment of this legislation, the legislative history, and the administrative interpretations of the Act, the Court has concluded that the Act was intended to apply, and does apply, only to public lands or to those mineral deposits which were reserved to the United States when the surface public land was patented.

Since Congress intended that this Act should apply only to public lands, the critical question in this case is whether marginal sea lands are public lands. Although there had been no judicial determination of this question, it appears that these lands were never considered public lands of the United States. As defined above public lands are those lands of the United States which are subject to sale or other disposal under general laws. The areas involved in this action were never held open for sale or other disposal. Furthermore, the public land surveys were never extended beyond the high tide line [24] and it has been held that unsurveyed lands are not public lands of the United States.[25] Rather than being considered public lands of the United States it appears that for many years these areas were believed to be the property of the adjacent state. This belief resulted from a series of cases which raised questions as to whether lands covered by inland waters and tidelands were public lands. In holding that tidelands were not public lands, the Court used such strong language that it was believed all submerged lands within the territorial jurisdiction of a State were State property,[26] regardless of whether they were tidelands, lands covered by inland waters or marginal sea lands. Excerpts from some of the more important of these decisions are set out herein.

The case of Pollard v. Hagan, 1845, 3 How. 212, 11 L.Ed. 565, set out the rule that Alabama, because admitted on "an equal footing" with the original states, thereby became the owner of the tidelands within its boundaries. As a result the title of an Alabama grantee to a tideland tract was held valid as against the

24. Barney v. Keokuk, 94 U.S. 324, 338, 24 L.Ed. 224.

25. U. S. v. Northern Pacific R. Co., 311 U. S. 317, 344, 61 S.Ct. 264, 85 L.Ed. 210.

26. United States v. California, supra, footnote 5, at page 36, of 332 U.S. at page 1667 of 67 S.Ct.:

"As previously stated this Court has followed and reasserted the basic doctrine of the Pollard case many times. And in doing so it has used language strong enough to indicate that the Court then believed that states not only owned tidelands and soil under navigable inland waters, but also owned soils under all navigable waters within their territorial jurisdiction, whether inland or not. All of these statements were, however, merely paraphrases or offshoots of the Pollard inland water rule, and were used, not as enunciation of a new ocean rule, but in explanation of the old inland water principle. * * *"

holder of a grant from the United States made after Alabama's admission as a state. The Court held, 3 How. at pages 228, 229, 11 L.Ed. 565:

> "Alabama is therefore entitled to the sovereignty and jurisdiction over all the territory within her limits subject to the common law, * * *. Then to Alabama belong the navigable waters, and soils under them, in controversy in this case, subject to the rights surrendered by the Constitution to the United States; and no compact that might be made between her and the United States could diminish or enlarge these rights."

Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331, involved a grant under the Oregon Donation Act, the act of September 27, 1850, 9 Stat. 496. This Act provided that "every white settler or occupant of the public lands" was entitled to a grant of 320 acres if certain conditions were fulfilled. In holding that grants under this Act could not include tidelands the Court, 152 U.S. at page 48, 14 S.Ct. at page 566, stated:

> "We cannot doubt, therefore, that congress has power to make grants of lands below high-water mark of navigable waters in any territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several states, or to carry out other public purposes appropriate to the objects for which the United States hold the territory.
>
> "But congress has never undertaken, by general laws, to dispose of such lands * * *."

In Mann v. Tacoma Land Co., 153 U.S. 273, 14 S.Ct. 820, 821, 38 L.Ed. 714 plaintiff claimed title to three tracts of tidelands in the Washington Territory acquired by location under Valentine scrip. This scrip which was authorized by a special Act of Congress permitted Valentine or the succeeding holders of the scrip to select, and patent "unoccupied and unappropriated public lands of the United States," in lieu of lands claimed by him under a Mexican grant. In holding the tidelands were not public lands the Court said, 153 U.S. at page 284, 14 S.Ct. at page 822:

> "It is settled that the general legislation of congress in respect to public lands does not extend to tide lands. There is nothing in the act authorizing the Valentine scrip, or in the circumstances which gave occasion for its passage, to make an exception of the general rule. It provided that the scrip might be located on the unoccupied and unappropriated public lands, but the term 'public lands' does not include tide lands. As said in Newhall v. Sanger, 92 U.S. 761 [23 L.Ed. 769]: 'The words "public lands" are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws.' (Citing cases.)"

It was not until the decision in the case of United States v. California, supra, that this erroneous belief in the State ownership of all submerged lands within its territorial jurisdiction was finally dispelled. In that decision the Court held that the Federal Government had paramount rights in and power over the three mile marginal belt along the California coast. This decision while it established the interest of the Federal Government in these lands did not hold that they were subject to lease under the Mineral Leasing Act. According to Section 1 of the Act it is only "deposits * * * and lands containing such deposits owned by the United States * * *" which are subject to disposition under the Act. The Court in the California decision did not hold that the marginal sea lands were "owned" by, or "belonged" to, the United States, it merely held, 332 U. S. at page 38, 67 S.Ct. at page 1668, that

> "* * * California is not the owner of the three-mile marginal

belt along its coast, and that the Federal Government rather than the state has paramount rights in and power over that belt, an incident to which is full dominion over the resources of the soil under that water area, including oil."

In order for lands to be public lands of the United States and subject to disposition under general laws they must first be owned by the United States. In the case of the marginal sea lands there has been no holding of ownership by the United States. Therefore while these are lands in which the interest of the United States is paramount, they are not public lands.

██ In consideration of the belief which prevailed for many years that the States held title to all submerged lands within their territorial jurisdiction, and of the California decision which finally established the interest of the United States in these lands but did not hold that they were owned by the United States, the Court is of the opinion that the marginal sea lands have not been and cannot now be regarded as public lands of the United States.

The holding of the Supreme Court in the case of United States v. California, supra, was nullified by the passage of the Act of May 22, 1953,[27] commonly known as the Submerged Lands Act. This Act quit-claimed the paramount interest of the United States in the submerged coastal lands and confirmed and established State title to these lands. However, any rights existing in these areas at the time of the enactment of the Submerged Lands Act were preserved by the Congress through the use of the following language in Section 8 of the Act.

"Nothing contained in this Act shall affect such rights, if any, as may have been acquired under any law of the United States by any person in lands subject to this Act and such rights, if any, shall be governed by the law in effect at the time

they may have been acquired:
\* \* \*."

Thus such rights, if any, as the Plaintiffs may have acquired have not been impaired in any way although the submerged lands upon which the lease applications have been filed are no longer under the jurisdiction of the United States.

Since it is the responsibility of the Court, in the interpretation of Statutes, to give effect to the intent of Congress,[28] the Court in the instant situation has endeavored to ascertain whether or not Congress intended that marginal sea lands should be included within the term Public Domain as that term is used in the Mineral Leasing Act. Since the Act does not, in terms, specifically mention the marginal sea lands the Court examined the legislative history of the Act in an effort to determine whether any consideration was given to the inclusion of these areas and whether there was any reference to the matter in any of the legislative proceedings which might serve to illuminate the subject. This review of the legislative history failed to disclose any evidence which would indicate that Congress contemplated these areas would be subject to lease under the Act. There are, however, provisions in the Act requiring survey, erection of monuments upon the land and the outlining of the boundaries of the tract upon the ground. The Defendant points out the fact of the physical inapplicability of these requirements to land lying under the marginal sea and contends that this fact is a definite indication that the submerged lands were not within the contemplation of Congress when it enacted this legislation. The Court is of the opinion that the contention of the Defendant is sound and concludes that it is impossible to reconcile the inclusion of the above requirements as to survey, erection of monuments upon the land and the outlining of the boundaries of the tract upon the ground with a legislative

---

27. 67 Stat. 29, 43 U.S.C.A. § 1301 et seq.

28. Supra, footnote No. 10.

intention to include the submerged lands in question within the scope of the Act.

Although Congress had on several occasions extended the applicability of the Mineral Leasing Act to lands which were not within the scope of the original act,[29] it has not taken any action specifically to include submerged coastal lands within the provisions of the Act. These areas have been referred to at only one point in the several Acts which have amended the Mineral Leasing Act or extended its scope. This reference is found in the Acquired Lands Act of 1947,[30] an act which authorized the issuance of mineral leases on lands which had been acquired by the United States. The acquired lands which are subject to the Act are, so far as relevant, defined in the Act to "include all lands heretofore or hereafter acquired by the United States to which the 'mineral leasing laws' have not been extended * * *". Submerged coastal lands appear to have been mentioned in this Act only for the purpose of expressly excluding them from its effect. The Solicitor in his opinion assumed that the reason for this exclusion of submerged coastal lands was that the Mineral Leasing Laws, as amended, had not been extended to these areas and that, therefore, they would be covered by the new act unless excluded from its effect. The Court, in the circumstances, is persuaded that this assumption of the Solicitor is justified.

The Court concludes, therefore, that the marginal sea lands are not public lands of the United States, and that they are not subject to lease under the Mineral Leasing Act which is limited in its applicability to public lands of the United States. The Plaintiffs prayer for injunctive relief is hereby denied.

Counsel for Defendant will prepare appropriate findings of fact, conclusions of law and order.

---

29. Act of September 15, 1922, 42 Stat. 844. Act of March 4, 1923, 42 Stat. 1448,

30 U.S.C.A. § 230 et seq. Act of June 27, 1930, 46 Stat. 819.

Act of May 23, 1934, 48 Stat. 796. Act of July 3, 1941, 55 Stat. 577.

30. Act of August 7, 1947, 61 Stat. 913, 30 U.S.C.A. § 351 et seq.